Stephen S. MAROZSAN, Plaintiff,

v.

UNITED STATES of America, the Veterans Administration, A.P. Cowan, W.R. Gladding, M.D., P. Moncure, James F. Sponzo, R.L. Hornbarger, J. Higgins, Dr. B. Gardner, Sydney J. Shuman, Max Cleland and H.M. Walters, Defendants.

Civ. No. 3:84cv0500 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Feb. 22, 1994.

Stephen S. Marozsan, pro se.

Clifford D. Johnson and J. Philip Klingeberger, Dyer, IN, for defendants.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

**I.**

The great Civil War historian, Kenneth P. Williams, quoted a letter from Abraham Lincoln to one of his generals:

"I regret to find you denouncing so many persons as liars, scoundrels, fools, thieves, and persecutors of yourself." Letter to Major General James G. Blunt. Kenneth P. Williams, *Lincoln Finds a General,* Vol. V, p. 106 (1959).

Such is an important backdrop to this case which is about to have its tenth anniversary

on the docket of this court. This court takes full judicial notice of all proceedings in this case, including the appellate proceeding and particularly the en banc decision reported in *Marozsan v. United States,* 852 F.2d 1469 (7th Cir.1988). Given the demands of the Civil Justice Reform Act of 1990, 28 U.S.C. §§ 471–482, and the regular work ethic of this court, a superficial examination of this record might cause one to question why it has taken so long since the decision of the Court of Appeals to once again address the issues in this case in finality. A closer examination of the record in this case will indicate variously and in detail why it has taken so long to arrive at this point, and this court is not the least apologetic about it.

This plaintiff is *pro se,* although he has had a series of lawyers representing him at various stages of these proceedings. This court is all too familiar with the demands of *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), which have been most recently explicated in a highly common sense fashion by Justice Stevens in *McNeill v. United States,* —— U.S. ——, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993), as follows:

It is no doubt true that there are cases in which a litigant proceeding without counsel may make a fatal procedural error, but the risk that a lawyer will be unable to understand the exhaustion requirement is virtually nonexistent. Our rules of procedure are based on the assumption that litigation is normally conducted by lawyers. While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed, see *Haines v. Kerner,* 404 U.S. 519 [92 S.Ct. 594, 30 L.Ed.2d 652] (1972); *Estelle v. Gamble,* 429 U.S. 97 [97 S.Ct. 285, 50 L.Ed.2d 251] (1976), and have held that some procedural rules must give way because of the unique circumstance of incarceration, see *Houston v. Lack,* 487 U.S. 266 [108 S.Ct. 2379, 101 L.Ed.2d 245] (1988) (pro se prisoner's notice of appeal deemed filed at time of delivery to prison authorities), we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without coun-

sel. As we have noted before, "in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 2497, 65 L.Ed.2d 532 (1980).

Following massive and extremely time-consuming proceedings on the defendant's motion for summary judgment, Magistrate Judge Robin D. Pierce entered his Report and Recommendation which generated an elaborate filing by the plaintiff on January 21, 1994, and a response thereto by the defendant, United States of America, on February 10, 1994. The beginning point for analysis here must be the narrow but significant window of opportunity afforded by the majority opinion in *Marozsan v. United States,* 852 F.2d at 1479, fn. 22. Certainly, there is nothing in the majority opinion or mandate of the Court of Appeals which prohibits the consideration of the issues there defined in the context of Rule 56 of the Federal Rules of Civil Procedure. To the contrary, fn. 22, *supra,* invites same.

## II.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762 (7th Cir.1993).

A thorough discussion of Rule 56 by the Supreme Court of the United States can be found in a trilogy of cases decided in 1986. *See, Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) [1]; and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards

under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56). A material question of fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

■ Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Hughes v. Joliet Correctional Center,* 931 F.2d 425, 428 (7th Cir.1991), or upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990).

■ During its analysis, this court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Brennan v. Daley,* 929 F.2d 346, 348 (7th Cir.1991). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–255, 106 S.Ct. at 2512–14.

The 1986 Supreme Court trilogy was recently re-examined in *Eastman Kodak v. Image Technical Services,* —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), a case born in the context of antitrust law. The most that can be said for *Kodak* is that it did not tinker with *Celotex* and *Anderson,* and

---

1. For the judicial epilogue of *Celotex,* see *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33 (D.C.Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

possibly involves an attempt to clarify *Matsushita*. This view is well supported by an in-depth academic analysis in Schwarzer, Hirsch, and Barrans, *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441 (1992).

### III.

It is readily apparent that Magistrate Judge Pierce has spent literally hundreds of judicial hours in attempting to sift through a most difficult record, made no less so by the frequent accusatory and acrimonious assertions by this *pro se* plaintiff. One must respect the service that this plaintiff has rendered to his nation, and can understand perhaps even empathize with some of his frustrations. However, it is the sworn duty of this court under Article III of the Constitution of the United States to apply the law as even-handedly as possible to all litigants, including *pro se* ones.

As a general proposition, this court is in full agreement with the careful analysis, reasoning and result outlined by the magistrate judge on December 10, 1993. The court chooses to make some additional comments but in no way are these comments to be interpreted as any criticism of or disagreement with Magistrate Judge Pierce.

Very recently, another judge of this court has most carefully delineated the proper standards to be applied under Rule 56 in *Hayden v. La–Z–Boy Chair Co.*, 838 F.Supp. 384 (N.D.Ind.1992). Specifically, Judge Lee very correctly emphasized that in order to determine the existence of a genuine issue of material fact:

> Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed. R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt, as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of*

*Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2512. *Id.* p. 387.

Apparently, a renewed effort is made here to challenge the constitutionality of 38 U.S.C. § 211(a), as follows:

> The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans. Subject to subsection (b), the decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise.
>
> (b) The second sentence of subsection (a) does not apply to—
>
> (1) matters subject to section 502 of this title;
>
> (2) matters covered by sections 1975 and 1984 of this title;
>
> (3) matters arising under chapter 37 of this title; and
>
> (4) matters covered by chapter 72 of this title.

(The same is re-codified now as 38 U.S.C. § 511(a)).

The Department of Veterans Affairs Health–Care Personnel Act of 1991, Pub.L. No. 102–40, § 402(b)(1), 105 Stat. 187, 238, and the Department of Veterans Affairs Codification Act, Pub.L. No. 102–83, § 2 and 5, 105 Stat. 378, 406 (1991), made numerous technical changes to Title 38, United States Code, including redesignation of the section numbers of various provisions to conform to the numbers of the chapters in which those provisions appear. For sake of clarity, this court will continue to use the old § 211(a) citation.

Apparently, an effort is made to assert that that statute violates the Eighth Amendment of the Constitution of the United States. With no disrespect intended, the subject matter of this statute is not close to the kind of considerations that violate the Eighth Amendment. *See*, for example, *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

During the first decade of the republic, it was held by Justice Samuel Chase in *Calder v. Bull*, 3 Dallas 386, 1 L.Ed. 648 (1798), that basically the *ex post facto* provision in Article I, Section 9, Clause 3 of the Constitution of the United States applied only to criminal statutes.

While there has been some argument in the intervening time about what may or may not be criminal proceedings, this case certainly does not involve the application of any federal criminal statute or for that matter, any state criminal statute. The *ex post facto* provision of the Constitution of the United States has no application here.

To the extent that the Court of Appeals has already ruled on the issue of the constitutionality of this statute, the same surely would now be binding on this plaintiff under the concepts of *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

Much is written here on the whole subject of possible claims under *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and this court will add very little. Claims under *Bivens* must be constitutional violations, and claims under 42 U.S.C. § 1983 are quite similar. The magistrate judge was completely correct that no such *Bivens* claims are here presented and that even if they were, they are clearly foreclosed by the statute of limitations.

■ There is no judicial remedy in this court available with reference to the so-called claims regarding false testimony before the Congress of the United States, even assuming that such false testimony was given by a defendant in this case. The absolute immunity that Justice Stevens defined in *Briscoe v. Lahue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), would cut a very wide swath through any such testimony, assuming that the necessary predicates could be established. Clearly, they have not been here.

A great deal of paper has been taken up in this record in regard to service of process under Rule 4(j) of the Federal Rules of Civil Procedure. This court and the magistrate judge have clearly adhered to the existing law in this regard, and if the law is to be changed, it will have to be done either through the rule-making process, the Congress, or decisions of higher courts in the federal judiciary.

Assertions are made with regard to an attempt to get this court to re-write the Supreme Court's decision in *Walters v. National Assn. of Radiation Survivors*, 473 U.S. 305, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985), as it interprets 38 U.S.C. § 5904(c). This court simply is without authority to do so. Such cases as *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), have no application here. The Sixth Amendment of the Constitution simply does not apply to this case.

This court is well aware of the decision in *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), with reference to the due process right to access to courts, and the argument advanced under that heading by the plaintiff simply fails. It is not the proper function of this court to re-write the Veterans Judicial Review Act (VJRA), Public Law No. 100–687, Div. A, 102 Stat. 4105 (1988). *See* 38 U.S.C. § 7252(a).

Neither is there a legitimate argument here under the Equal Protection Clause of the Fourteenth Amendment, which concept has also been applied to the federal government under the Fifth Amendment. Again, not to be disrespectful, but there is no suspect classification involved in this case. For example, see *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). When dealing with this species of social welfare legislation which does not involve an inher-

ently suspect classification, Congress is rightfully given wide latitude under the Constitution to legislate without judicial interference. *See United States R.R. Retirement Board v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). *See also Belarmino v. Derwinski,* 931 F.2d 1543 (Fed.Cir.1991), and *Nagac v. Derwinski,* 933 F.2d 990 (Fed. Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 384, 116 L.Ed.2d 335 (1991).

A word needs to be said with regard to the existence of absolute immunity from money damage claims to which veterans administrative adjudicators are protected. It is certainly a species of judicial immunity, as exemplified in *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), and *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). That immunity has been extended well beyond common law judges. *See McCray v. Maryland,* 456 F.2d 1 (4th Cir.1972).

■ There are some issues which appear to be asserted for the first time in the plaintiff's filings of January 21, 1994. It needs to be re-emphasized that evidence which is inadmissible cannot be considered in formulating whether there is a genuine issue of material fact under Rule 56. In the same vein, evidence that is purely hearsay cannot be considered in that formulation. The court is familiar with some of the dimensions of the so-called Privacy Act, 5 U.S.C. § 552a. *See Doe v. Dept. of Navy,* 764 F.Supp. 1324 (N.D.Ind.1991). This court does not conceive that the Privacy Act has anything to do with this case. Neither is it possible for this court to sit in an administrative capacity to correct military records. *See Ortiz v. Secretary of Defense,* 842 F.Supp. 7 (D.D.C.1993). *See also Green v. Skulute,* 839 F.Supp. 797 (D.Wyo.1993).

■ This court has profound respect for the values that inhere in the Seventh Amendment of the Constitution of the United States. Delineating what are jury trial issues and what are not is not always an easy task. *See Lorillard v. Pons,* 434 U.S. 575 (1978). In any event, if there were valid claims for money damages which could survive summary judgment, this plaintiff might be entitled to a Seventh Amendment jury

trial. However, any valid claims which are for injunctive relief are for the court to decide in equity. The long and short of the magistrate judge's report and recommendation is that there is no valid basis for relief here stated for money damages or injunctive relief and for that reason summary judgment is granted.

It has already been stated that 42 U.S.C. § 1981, § 1982, § 1983, § 1985, and § 1986 do not provide any basis for relief to this plaintiff in this case. Neither do 18 U.S.C. § 241 and § 242. *See Snyder v. IRS,* 596 F.Supp. 240 (N.D.Ind.1984). *See also Powers v. Karen,* 768 F.Supp. 46 (E.D.N.Y.1991). This court does not conceive that this plaintiff has any basis for recovery under 5 U.S.C. § 7324 or § 1206. The enforcement of those statutes is elsewhere. *See Blaylock v. U.S. Merit Systems Protection Board,* 851 F.2d 1348 (11th Cir.1988).

The plaintiff has also requested that Magistrate Judge Pierce recuse himself from this case.

Title 28 U.S.C. § 144 states:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient *affidavit* that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

As amended May 24, 1949, c. 139, § 65, 63 Stat. 99. (emphasis added)

■ *United States v. Sibla,* 624 F.2d 864, 868 (9th Cir.1980), provides that a motion brought under § 144 will raise a question concerning recusal under § 455(b)(1) as well;

the test for personal bias or prejudice is the same in both. Section 455 modifies § 144 in requiring the judge to go beyond the § 144 affidavit and consider the merits of the motion pursuant to § 455(a) and (b)(1).

*United States v. Bryant*, 716 F.2d 1091 (6th Cir.1983), also provides that §§ 144 and 455 must be construed together, and that disqualification under § 455(a) must be predicated as previously under § 144, upon *extra judicial conduct*, rather than *judicial conduct* [citing *City of Cleveland v. Krupansky*, 619 F.2d 576 (7th Cir.1980)].

*United States v. International Business Machines Corporation*, 475 F.Supp. 1372 (S.D.N.Y.1979) (hereafter I.B.M.), is an important object lesson provided by Judge David N. Edelstein, who presided over one of the federal judiciary's longest and most complicated antitrust trials, in the middle of which the defendant, not pleased with various rulings of Judge Edelstein, tried to require his recusal. The aforesaid case was affirmed in *In re International Business Machines Corporation*, 618 F.2d 923 (2d Cir. 1980). The holding in the I.B.M. case is that to be legally sufficient, an affidavit under § 144 must enable the judge to rule "whether the reasons and facts stated in the affidavit give fair support to the charge of a bent of mind that might impede the impartiality of the judgment" (p. 1379) [citing *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921)].

■ The aforesaid affidavit under § 144 must allege specific facts and not mere conclusions or generalities. A United States magistrate judge is presumed impartial, and a substantial burden is imposed on the affiant to demonstrate that such is not the case. Only after a judge finds a legal sufficient claim of personal bias must another judge be assigned to the case (p. 1379).

In *New York City Development Corp. v. Hart*, 796 F.2d 976 (7th Cir.1986), it is held that § 455(a) requires disqualification only when a judge's decision might "reasonably" be questioned. The inquiry is objective, from the point of view of a reasonable person with access to all of the facts. *Id.* at 980.

In *Union Carbide Corp. v. U.S. Cutting Service, Inc.*, 782 F.2d 710 (7th Cir 1986), a case which involved District Judge Getzendanner, it was stressed that the test is whether an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought, would entertain a significant doubt that justice would be done in the case [citing *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460 (7th Cir.1985)]. *See also United States v. Murphy*, 768 F.2d 1518, 1538 (7th Cir.1985).

In *United States v. Harris*, 542 F.2d 1283 (7th Cir.1976), a case in which this Judge acted as the district trial judge, it was held that a judge's exposure to evidence presented at an earlier trial involving the same defendant does not *per se* create bias (p. 1304). Again, in *United States v. Jeffers*, 532 F.2d 1101 (7th Cir.1976), the Court of Appeals at page 1112 stated:

> The two basic facts presented by the defendant's motion are 1) that Judge Sharp had presided and would preside over numerous trials concerning alleged Family members, and 2) that Judge Sharp presided at the defendant's prior trial. The defendant alleged no facts which directly showed Judge Sharp's bias, but relied only on the inference that the intimate connection with the defendant's prior trial and other Family trials would create bias.

> We have dispatched this type of claim before. In *United States v. Dichiarinte*, 445 F.2d 126, 132 (7th Cir.1971), Judge Swygert wrote:

> > The fact that the judge might have formed an opinion concerning the guilt or innocence of the defendant from the evidence presented at an earlier trial involving the same person is not the kind of bias or prejudice which requires disqualification.

> *Accord, Wolfson v. Palmieri*, 396 F.2d 121 (2d Cir.1968). Similarly, "inferences drawn from prior judicial determinations are insufficient grounds for recusal because it is the duty of the judge to rule upon issues of fact and law and questions of conduct which happen to form a part of the proceedings before him." *United*

States v. Partin, 312 F.Supp. 1355, 1358 (E.D.La.1970).

Many of the aforesaid authorities have previously been summarized by this court in McChristion v. Hood, 551 F.Supp. 1001 (N.D.Ind.1982). The Court of Appeals has also dealt with this subject in the Matter of National Union Fire Insurance of Pittsburgh, Pennsylvania and Allstate Insurance Company, 839 F.2d 1226 (7th Cir.1988). See also United States v. Barnes, 909 F.2d 1059 (7th Cir.1990). For an application of 28 U.S.C. § 144 in a lighter vein, see Huff v. Standard Life Insurance Company, 643 F.Supp. 705 (S.D.Fla.1986). See also Person v. General Motors Corporation, 730 F.Supp. 516 (W.D.N.Y.1990). For an example of where judicial disqualification exists, see United States v. Pepper & Potter, Inc., 677 F.Supp. 123 (E.D.N.Y.1988). But compare Grand Entertainment Group, Ltd. v. Arazy, 676 F.Supp. 616 (E.D.Pa.1987).

In Hadler v. Union Bank and Trust Co. of Greenburg, 765 F.Supp. 976 (S.D.Ind.1991), Judge Tinder held that a judge's friendship with a witness who had a financial stake in the outcome of the action and whose credibility would be at issue in a case tried by the court warranted recusal.

In United States v. Troxell, 887 F.2d 830 (7th Cir.1989), Judge Coffey stated:

"The fact that knowledge of the defendant was gained in separate courtroom proceedings presided over by the same judicial officer does not alter the judicial character of the knowledge. United States v. Dichiarinte, 445 F.2d 126, 132 (7th Cir.1971). Judge Mills' decision to proceed with the case was proper."

See also Greater Buffalo Press v. Federal Reserve Bank, 129 F.R.D. 462 (W.D.N.Y. 1990).

In United States of America ex rel. John Britz v. James Thieret, 737 F.Supp. 59 (C.D.Ill.1990), Judge Richard Mills held that there was no appearance of impropriety warranting recusal when a district judge, who was a member of a state appellate panel that reversed the petitioner's original conviction, presided over the petitioner's habeas petition challenging a second conviction for the same offense.

In Spangler v. Sears, Roebuck & Co., 759 F.Supp. 1327 (S.D.Ind.1991), Judge Tinder ruled that language in a published opinion that was critical of counsel was not a basis to require recusal absent showing there was extrajudicial source for the court's alleged bias and that bias is pervasive.

In United States v. Kehlbeck, 766 F.Supp. 707 (S.D.Ind.1990), Judge Tinder held that the defendant was not entitled to recusal of judge for actual bias under § 144, and further held that the defendant was not entitled to recusal of judge for appearance of bias under § 455(a).

In Sexson v. Servaas, 830 F.Supp. 475 (S.D.Ind.1993), Judge Barker held that the fact that the district judge was a member of boards of two not-for-profit civil organizations did not require the judge to recuse herself.

Magistrate Judge Pierce is not disqualified under either 28 U.S.C. § 144 or § 455. There is no assertion here whatsoever that Magistrate Judge Pierce is in any capacity other than in his judicial capacity. In that regard, he has been enormously patient and careful. The fact that someone may not agree with his decision does not create a disqualification under either § 144 or § 455.

Therefore, the motion to disqualify Magistrate Judge Pierce is now carefully considered and **DENIED** in its entirety. **IT IS SO ORDERED.**

There can be no doubt that this case in its larger sense touches some very sensitive social nerves in the body politic. It has been said often and variously that you can tell about a society by the way it treats those convicted of crime or those who are disadvantaged. It can be equally true of the social dynamic of how a free democratic society treats those who served it faithfully in its military is of enormous importance. The values involved are deeply embedded in the culture and history of this republic. It is equally true that the Constitution of the United States, which those in the military have fought to defend variously for over two centuries, provides, quite appropriately, a

government of distinct and separate responsibilities often called checks and balances or separation of powers. There has been a debate almost continuously in the history of the Constitution as to proper scope and function of the exercise of federal judicial authority. At different periods in history there has been an ebb and a flow of how much judicial activism on the one hand and how much judicial restraint on the other should there be in society. In *Calder v. Bull* in 1798 the opinion of Justice Samuel Chase was a clarion call for judicial activism, the kind that especially found favor in the 1890's as substantive due process. In the same case, the opinion of Justice James Iredell spoke to a much more restrained view of judicial power which gave honor and sustenance to the elected representatives of the people who served in Congress and in the various state legislatures. It has been wisely said that there is not a judicial remedy for every evil and ill in society, and perhaps that statement ought to be modified today to emphasize that there is especially not a federal judicial remedy. A decent respect for the various responsibilities of the coordinate branches of the government is not a copout, but a fulfillment of the highest aspirations of those who wrote the Constitution of the United States in Philadelphia in 1787. Additionally, in cases such as this, it may fervently hope that the Congress can, has and will provide wise and compassionate legislation to fulfill the admonition in Abraham Lincoln's Second Inaugural Address to "care for him who shall have borne the battle and for his widow, and his orphan . . . ."

It is the sworn duty of the magistrate judge and of this court to consider cases on the record before it to determine whether there is a genuine issue of material fact to go forward, keeping in mind the mandate of the Court of Appeals, which this court is duty bound to respect and honor. The magistrate judge and this court have concluded that there is no such genuine issue of material fact. Therefore, the Report and Recommendation is **APPROVED**. Summary judgment for the defendants and against the plaintiff is **GRANTED**. Each party will bear its own costs. It is the intention by this Memorandum and Order to enter a final, appealable decision. **IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION

PIERCE, United States Magistrate Judge.

Since 1953, Stephen S. Marozsan has been fighting with the Veterans Administration, now the Department of Veterans Affairs (the "V.A."),[1] and a growing number of perceived adversaries, over a claim for veterans' disability benefits. He brought the present action in 1984, claiming among other things that the procedures followed by the V.A. in adjudicating his benefits claim violated his right to due process under the Fifth Amendment. Chief Judge Sharp thereafter granted summary judgment in favor of the United States and the V.A., holding that 38 U.S.C. § 211(a)[2] "bars a court from hearing and reviewing an action challenging a decision of the V.A., even when a plaintiff alleges that the decision violates his constitutional rights." *Marozsan v. United States*, 635 F.Supp. 578, 580 (N.D.Ind.1986). On appeal, the Seventh Circuit, in an *en banc* decision, *Marozsan v. U.S.*, 852 F.2d 1469 (7th Cir. 1988), affirmed in part, reversed in part, and remanded the case to this court for further proceedings on Marozsan's constitutional challenge to V.A. procedures. Following remand, Marozsan was allowed to file a third amended complaint which added a *Bivens* action against a number of V.A. employees,

1. The Veterans Administration became the Department of Veterans Affairs on March 15, 1989. For convenience, the agency will be referred to as the "V.A." throughout this Report and Recommendation.

2. At the time of Judge Sharp's decision, 38 U.S.C. § 211(a) provided as follows:
 On and after October 17, 1940, except as provided section 775, 784, and as two matters arising under chapter 36 of the title, the decisions of the Administrator on any question of law or fact under any law administered by the Veterans Administration providing benefits for veterans and their dependents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise.
 38 U.S.C. § 211(a) was subsequently amended and recodified as 38 U.S.C. § 511(a).

including John M. Higgins, a V.A. Adjudication Officer. This case is now before the court on *motions to dismiss, or alternatively for summary judgment,* by defendants Higgins, the United States and the V.A.

## Background

To qualify for disability compensation benefits, a veteran must show that his or her disability is "service-connected," meaning that the disability "was incurred or aggravated ... in the line of duty in the active military, naval or air service." 38 U.S.C. § 101(16). After a veteran has submitted a claim for benefits on an appropriate form, 38 C.F.R. § 3.151(a), the claim is reviewed by a three-person Rating Board at a V.A. Regional Office. Claimants are "entitled to a hearing at any time on any issue involved in a claim," 38 C.F.R. § 3.103(c), as well as representation of their choice at every stage of the proceedings. 38 C.F.R. § 3.103(e). The proceedings before the Rating Board are *"ex parte* in nature, and it is the obligation of the [V.A.] to assist a claimant in developing the facts pertinent to the claim and to render a decision which grants every benefit that can be supported in law while protecting the interests of the Government." 38 C.F.R. § 3.103(a). All reasonable doubts are to be resolved in favor of the claimant. 38 C.F.R. § 3.102. The principal issues are the extent of the claimant's disability and whether the disability is service-connected. "Service connection connotes many factors but basically it means that the facts, shown by evidence, establish that a particular injury or disease resulting in disability was incurred coïncident with service in the Armed Forces, or if preexisting such service, was aggravated therein." 38 C.F.R. § 3.303(a).

If the Rating Board determines that a particular condition is service-connected, it assigns a disability rating from 0 percent to 100 percent. In general, the higher the percentage of disability, the more money a claimant receives as a monthly benefit. The claimant is then notified in writing of the Rating Board's decision, its reasons, the date the decision will become effective, and the right to a hearing. The claimant may then initiate an appeal by filing a Notice of Dis-

agreement with the local agency. 38 C.F.R. § 3.103(f). When a Notice of Disagreement is timely filed, the local agency must reexamine the claim and determine if additional review or development is warranted. 38 C.F.R. § 19.26. If the local agency adheres to its decision, it must prepare a Statement of the Case containing a summary of the evidence and the applicable laws and regulations, together with a determination on each issue. 38 C.F.R. §§ 19.26, 19.29.

The claimant may then appeal to the Board of Veterans' Appeals ("BVA"). A hearing before the BVA will be granted if the claimant expresses a desire to appear in person. 38 C.F.R. § 20.700(a). Such hearings are subject to essentially the same rules as are hearings before the local agency. *See* 38 C.F.R. § 20.700. Prior to the enactment of the Veterans' Judicial Review Act of 1988, Pub.L. No. 100–687, Div. A, 100 Stat. 4015 (1988) ("VJRA"), the BVA's decisions were not subject to judicial review. Under the VJRA, however, claimants are permitted to appeal BVA decisions to the newly-created Court of Veterans Appeals, and then to the Federal Circuit. *See National Ass'n of Radiation Survivors v. Derwinski,* 994 F.2d 583, 587 (9th Cir.1992); *Larrabee by Jones v. Derwinski,* 968 F.2d 1497 (2nd Cir.1992).

## Procedural History

Marozsan's service in the military began when he enlisted in the U.S. Navy on November 17, 1943. After graduating from the Northwestern U.S. Naval Radio School as a radio operator, he was stationed in the Aleutian Islands where he remained for the duration of World War II. On May 26, 1946, he was honorably discharged with a radioman second class rating. He then re-enlisted in the U.S. Navy in April, 1948, as a radioman second class operator. During his second term of enlistment, he helped erect a training facility at the South Bend Naval Reserve Training Center. On September 30, 1949, he again was honorably discharged from the Navy with a radioman second class rating.

Marozsan filed an application for veterans' disability benefits with the V.A. in May, 1953. His claim, based upon a back injury that allegedly occurred during his second term of

enlistment, was denied by the V.A.'s Indianapolis Regional Office, and he appealed that decision to the Board of Veterans' Appeals ("BVA"). On May 27, 1955, the BVA denied Marozsan's claim of service connection with respect to a back condition.[3] Although Marozsan reopened his claim for service connection, based upon a back condition, in October, 1971, that claim was also disallowed by the Regional Office. (Deposition of Steven Marozsan taken on Nov. 28, 1989, p. 17.)

In 1977, Marozsan again sought to reopen his claim, but the Regional Office again denied service connection for a back condition. The BVA subsequently concluded, in a decision issued on February 20, 1980, that "[t]he additional evidence submitted since [its] previous decision ... [did] not establish a new factual basis with respect to the issue of entitlement to service connection for a disability of the lumbo sacral spine." Accordingly, the BVA held that its 1955 decision was final and denied the claim. (Attachment 2 to Declaration of Martin Sendek, p. 9.) After Marozsan requested reconsideration, the BVA issued a decision on June 17, 1981, granting service connection for his lower back condition, based upon a difference of opinion. Benefits were granted retroactive to March 25, 1980, the date of his request for reconsideration.[4]

---

3. The BVA's May 27, 1955 decision included the following rationale:

> Official records show no findings relative to a back injury or treatment during the first period of service and no pertinent defect was noted at discharge. As to the second period of service the clinical findings reported together with recorded clinical data established the existence of back injury with recurrent back strain in 1947 prior to the second period of service. The symptoms reported in service were due to the inherent nature of the preexisting basic back condition. The Board concludes that the evidence does not establish an increase in severity of the preexisting basic back condition during the second period of service, in the absence of which a finding of aggravation is not warranted. Considering the record in its entirety, the Board concludes that the evidence does not permit the grant of service connection for a back condition including herniated nucleus pulposus.

(Attachment 1 to Declaration of Martin Sendek, p. 2.)

4. The BVA's June 17, 1981 decision concluded with the following:

Following the BVA's decision of June 17, 1981, Marozsan's case was returned to the Regional Office for rating action. He subsequently underwent a V.A. examination on July 24, 1981. Thereafter, on August 12, 1981, the Regional Office issued an administrative decision which granted a 20 percent evaluation for his back disorder, "on the basis of the grant of service connection by the Board of Veterans' Appeals and on the basis of a current medical examination conducted at the Veterans Administration Medical Center." The decision "continued the evaluations for the nonservice-connected conditions and showed the continued entitlement to nonservice connected pension benefits...." It was noted that "[t]he evaluation of the service-connected condition was made on the reported examination which included the subjective complaints and the history given by the veteran." (Affidavit of John M. Higgins, Ex. 2, p. 3.) On October 9, 1981, after Marozsan filed a notice of disagreement, the Rating Board at the Regional Office determined that the August 12, 1981 rating decision contained a "clear and unmistakable" error because it failed to base the initial rating on the information then available in Marozsan's file at the point of remand by the BVA. That information showed that Maroz-

> While neither error in the prior determinations nor a new factual basis warranting allowance has been found, the Board is of the opinion that there is a sufficient latitude in the evaluation of the evidence to permit a different conclusion on the basis of difference of opinion as to the severity of an injury incurred during the veteran's period of service and whether it may have aggravated a preexisting disability of the back. We feel that an injury did occur shortly before the veteran was separated from the service and there is significant evidence to the effect that there was a continuity of symptoms following the injury in 1949 that could support a conclusion that a chronic disability was aggravated at that time. Accordingly, it is recommended to the Chairman or Vice Chairman of the Board that service connection for a back disability be allowed administratively on the basis of difference of opinion. If approved, the request for further consideration received on March 25, 1980, will be accepted as date of application to reopen the claim after final adjudication, within the meaning of the laws and regulations governing effective dates of awards. (C.F.R. citations omitted.)

san's back condition was rated at 40 percent for nonservice-connected pension purposes. To correct this perceived error, defendant Higgins and the Rating Board increased Marozsan's rating to 40 percent from the date of remand by the BVA, March 25, 1980, to the date of Marozsan's most recent physical examination, July 24, 1981. (Higgins Affidavit, p. 5; Ex. 1.) However, because the Rating Board believed that the 20 percent evaluation for Marozsan's back condition was correct, based upon the findings of his July, 1981 medical examination, it gave him a 20 percent rating from July, 1981 forward. (Higgins Affidavit, p. 5; Ex. 1.) Marozsan appealed.

In a decision issued on September 7, 1982, the BVA remanded the case for further development of the medical evidence, adjudicative action with respect to Marozsan's claim for a 100 percent rating due to individual unemployability, and for consideration of his request for an increased rating. (Attachment 4 to Declaration of Martin Sendek, p. 3.)

While the case was on remand, Marozsan requested and was granted a hearing before a travelling panel of the BVA sitting in Indianapolis, in August, 1983. (Attachment 5 to Declaration of Martin Sendek, pp. 2, 8.) After hearing the evidence, the BVA issued a detailed decision on May 7, 1984, denying Marozsan an increased disability rating.

On August 15, 1984, Marozsan filed the present action *pro se* against the United States of America, the Attorney General, the Veterans Administration, Administrator Harry N. Walters, V.A. Regional Adjudication Officer R.L. Hornbarger, the National American Legion, Robert E. Lyngh, Director of Veterans Affairs & Rehabilitation, and the National American Legion Executive Officers. The complaint alleged that a number of V.A. regulations had been violated; that the V.A. had utilized an arbitrary quota system in processing claims; that Marozsan had been denied due process; and that 38 U.S.C. § 211(a), which precluded judicial review of V.A. decisions, denied equal protection to veterans. The complaint requested an order directing the V.A. to restore Marozsan's "rightful" disability rating, an injunction di-

recting the V.A. to follow its regulations and guidelines, a 100 percent unemployability rating and an award of $5,000,000 in damages for violating his rights.

On October 16, 1984, Marozsan filed an amended complaint, with the assistance of counsel, alleging that the V.A. had refused to recognize witnesses or evidence, harassed him, failed to abide by its own rules and regulations and utilized an improper quota system. The amended complaint further alleged that the "use and existence of 38 U.S.C. § 211 denies the Plaintiff due process of law, and the existence of violations permits the court to review Plaintiff's case pursuant to 5 U.S.C. § 42." Marozsan again sought an increase in his disability rating and damages, but added a claim for retroactive benefits to the date of his alleged disability.

Chief Judge Sharp subsequently dismissed all of the defendants except the United States and the V.A., converted their motion to dismiss to a motion for summary judgment, and granted summary judgment in their favor, thus rejecting Marozsan's equal protection challenge to § 211(a) and holding that the statute "bars a court from hearing and reviewing an action challenging a decision of the V.A., even when a plaintiff alleges that the decision violates his constitutional rights." *Marozsan*, 635 F.Supp. at 580.

On appeal, the Seventh Circuit held that "§ 211(a) bears a rational relationship to the legitimate state ends of ensuring adequate and uniform decisions on veterans' benefits decisions," *Id.* at 1471 n. 3, and affirmed that portion of the district court's decision granting summary judgment in favor of the defendants on Marozsan's equal protection challenge to § 211(a). However, the Seventh Circuit concluded that § 211(a) did not deprive a federal court of jurisdiction to entertain Marozsan's claim that the V.A. violated his constitutional rights by employing arbitrary methods of determining which benefits claims to grant. Accordingly, the Court of Appeals reversed, and directed the district court to "assume federal question jurisdiction over Marozsan's due process claims under 28 U.S.C. § 1331." *Id.* at 1479.

On December 29, 1988, following remand of the case from the Seventh Circuit, Marozsan was granted leave to file another amended complaint in which he again alleged that "[t]he use and existence of 38 U.S.C. Sec. 211 denies the Plaintiff due process of law, and the existence of violations permits the Court to review Plaintiff's case pursuant to 5 USC 43." The amended complaint further alleged that "[t]he actions of employees of the Defendant have resulted in the Plaintiff being denied his rights and privileges granted to him by Federal statute." Marozsan's second amended complaint made no demand for monetary damages, but instead requested an injunction directing the V.A. to conduct a new hearing to determine his disability rating, to desist from violating his constitutional rights and to award him retroactive benefits commencing with the initial date of filing. The parties thereafter proceeded with discovery. Pursuant to a Rule 16 status conference conducted on February 20, 1990, the court directed that any requests for class certification and any motion by the plaintiff seeking leave to file any amendment to the pleadings be filed on or before May 1, 1990.

On May 1, 1990, Marozsan, who was then represented by Professor Frank E. Booker of the Notre Dame Law School, moved for leave to file a third amended complaint, his second following appeal. Count III of his proposed third amended complaint included an action under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which sought damages against various officers or officials of the V.A. who allegedly violated his constitutional rights under the First and Fifth Amendments. Those defendants included A.P. Cowan, W.R. Gladding, M.D., P. Moncure, James F. Sponzo, R.L. Hornbarger, J. Higgins, Dr. B. Gardner, Sydney J. Shuman, Max Cleland and H.M. Walters.

Professor Booker withdrew as Marozsan's counsel on November 1, 1990. In a Report and Recommendation issued on December 18, 1990, the undersigned found that Marozsan's *Bivens* claims under Count III were barred by the applicable statute of limitations, and recommended that leave to amend be denied. That recommendation was subse-quently adopted by Judge Sharp. However, on February 14, 1992, the undersigned decided, upon reconsideration, that Marozsan should be granted leave to file a re-drafted third amended complaint setting forth his *Bivens* action under Count II. In doing so, the undersigned observed that "it is best to allow the amendment and then to consider any defenses raised by defendants through a fully briefed motion to dismiss or motion for summary judgment," and noted that the "timeliness of plaintiff's *Bivens* claims can best be examined in the context of a motion to dismiss or motion for summary judgment, after a full opportunity for briefing." On March 30, 1992, Marozsan filed his "Re-Drafted Third Amended Complaint" (hereinafter third amended complaint), and on April 2, 1992, Judge Sharp adopted the February 14, 1992 Report and Recommendation.

After contacting some 38 attorneys in an effort to secure counsel for Marozsan (Transcript of Aug. 3, 1992 status conference, p. 7), the court was finally successful in locating two very able and experienced attorneys who agreed to undertake joint representation. Accordingly, on May 29, 1992, the court appointed Hamid Kashani of Indianapolis and Wyatt Mick of Elkhart as counsel for Marozsan. On June 25, 1992, however, Marozsan filed a motion seeking to discharge his court-appointed attorneys, asserting that they were only interested in representing him on a part-time basis, "with Hamid Kashani willing to only put forth 400 Hours into the case." Marozsan indicated that he was "under severe apprehensions of such part time representations would tremendously advantage the Defendant's [sic] numerous full time, current and uptodate [sic] U.S. Attorneys representations and would in effect cause 'FUNDAMENTAL UNFAIRNESS IMPINGING ON DUE PROCESS.'" Both Mick and Kashani subsequently filed motions for leave to withdraw.

During a status conference conducted on August 3, 1992, Marozsan advised the court of his desire to proceed *pro se:*

I would like to make this additional comment, with no disrespect intended to either of the two learned counselors. After studying for the last three weeks, there

are Federal Rules of Evidences and Procedures, cross-examination, direct examination, and all that. I cannot perceive how either of these two gentlemen would be able to adequately, with the time restraints on them, do the job when this case is one of the most massive and complex cases that's been in this court for quite some time.

I feel that I'm the only one competent enough and has the knowledge, after 40 years. I feel that after all the years that I've put in at law school, pursuing and updating myself on Federal Rules of Evidences, procedures, direct examination, cross-examination, hearsay, rules of evidences, all the way down the line, so that we can eliminate as much of the time spent in the trial, where any uncertainty on my part would hesitate and cause more time.

Therefore, I feel, with all that, that I would be the most competent. And I think it would be to my advantage to continue this case pro se.

(Hearing of August 3, 1992, Tr. 4–5.) After hearing from Kashani and Mick, the court granted their requests for leave to withdraw.

During the same hearing, counsel for the United States pointed out that Marozsan had failed to serve any of the *Bivens* defendants with summons and his third amended complaint within 120 days, as required by Rule 4(j) of the Federal Rules of Civil Procedure. Accordingly, on August 4, 1992, the court issued an order directing Marozsan to file a written statement, on or before August 14, 1992, showing good cause why service was not effected within the 120–day time limitation. He submitted several documents in response or reaction to that Order, but only one of them, his "Statement to the Court 'Showing Good Cause' Why Service of Summons Have not Been Executed todate [sic], as Ordered by the U.S. Magistrate's Order of August 4, 1992," was filed by the August 14, 1992 deadline.

Thereafter, on October 23, 1992, the United States, on behalf of the V.A., filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, or alternatively for summary judgment. The United States accompanied its alternative motion with a notice advising Marozsan in the spirit of *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir.1982). On December 10, 1992, Higgins, one of the individual *Bivens* defendants, filed a motion to dismiss under Rules 4(j), 12(b)(1), 12(b)(3) and 12(b)(6), or alternatively for summary judgment. Higgins also provided Marozsan with a similar notice advising of the effect of his motion to dismiss or for summary judgment.

### 12(b)(6) Standard

█ Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of complaints that state no actionable claim. When reviewing *pro se* complaints, the court must employ standards less stringent than if the complaint had been drafted by counsel. *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Jones v. Morris,* 777 F.2d 1277 (7th Cir.1985). The court must accept as true all well-pleaded factual allegations and inferences which may reasonably be drawn from those facts. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Corcoran v. Chicago Park District,* 875 F.2d 609, 611 (7th Cir. 1989); *Gomez v. Illinois State Board of Education,* 811 F.2d 1030 (7th Cir.1987); *Vaden v. Village of Maywood, Ill.,* 809 F.2d 361, 363 (7th Cir.), *cert. denied,* 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 381 (1987); *Hampton v. City of Chicago,* 484 F.2d 602 (7th Cir. 1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974). At the same time, the court is not required to " 'ignore any facts set forth in the complaint that undermine the plaintiff's claim....' " *Martin v. Davies,* 917 F.2d 336, 341 (7th Cir. 1990), *quoting Gray v. Dane County,* 854 F.2d 179, 182 (7th Cir.1988). A motion to dismiss will not be granted under these circumstances unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Illinois Health Care Ass'n v. Illinois Dept. of Public Health,* 879 F.2d 286, 288 (7th Cir.1989); *Gomez v. Illinois State Board of Education,* 811 F.2d

1030 (7th Cir.1987); *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986); *French v. Heyne,* 547 F.2d 994 (7th Cir.1976). A plaintiff may not avoid dismissal, however, merely by attaching bare legal conclusions to narrated facts which fail to outline the basis of his claims. *Perkins v. Silverstein,* 939 F.2d 463 (7th Cir.1991); *Strauss v. City of Chicago,* 760 F.2d 765, 767–68 (7th Cir.1985); *Sutliff, Inc. v. Donovan Companies,* 727 F.2d 648, 654 (7th Cir.1984).

*Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for the motion, and identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, once a properly supported motion for summary judgment is made, the party that bears the burden of proof on a particular issue at trial cannot resist the motion by merely resting on its pleadings. *U.S. v. Lair,* 854 F.2d 233, 235 (7th Cir.1988). Rather, the party opposing the motion must "affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC,* 840 F.2d 405, 410 (7th Cir. 1988); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir. 1987). "A genuine issue for trial only exists when there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party." *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2553.

"Supporting materials designed to establish issues of fact in a summary judgment proceeding 'must be established through one of the vehicles designed to ensure reliability and veracity—depositions, answers to interrogatories, admissions and affidavits. When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.'" *Friedel v. City of Madison,* 832 F.2d 965, 970 (7th Cir.1987), *quoting Martz v. Union Labor Life Insurance Co.,* 757 F.2d 135, 139 (7th Cir.1985). Affidavits presented in opposition to a motion for summary judgment must be based upon personal knowledge; a statement merely indicating that a purported affidavit is based upon "information and belief" is insufficient. *Price v. Rochford,* 947 F.2d 829, 832–33 (7th Cir.1991); *Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 659 (7th Cir.1991); *Schertz v. Waupaca County,* 875 F.2d 578, 582 (7th Cir. 1989); *Amcast Indus. Corp. v. Detrex Corp.,* 779 F.Supp. 1519, 1526 (N.D.Ind.1991). Rule 56(e) requires that any such affidavits "set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters stated therein." Inadmissible hearsay contained in affidavits or other discovery materials such as interrogatories or depositions cannot be considered. *Horta v. Sullivan,* 4 F.3d 2, 8–9 (1st Cir.1993) (newspaper article which contained "hearsay within hearsay" could not be considered); *Mitchell v. Toledo Hospital,* 964 F.2d 577, 584–85 (6th Cir.1992) (affidavit which contained nothing more than rumors, conclusory allegations and subjective beliefs could not be considered); *Hong v. Children's Memorial Hospital,* 993 F.2d 1257, 1264 (7th Cir.1993) ("We do not consider hearsay statements that are otherwise inadmissible at trial, and this limitation applies to deposition testimony based on inadmissible hearsay."); *Cormier v. Pennzoil Exploration & Production Co.,* 969 F.2d 1559, 1561 (5th Cir.1992); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990) (refusing to consider interrogatory answer which contained hearsay); *Pfeil v. Rogers,* 757 F.2d 850, 862 (7th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986); *Liberty Leasing Co. v. Hillsum Sales Corp.,* 380 F.2d 1013, 1015 (5th Cir.1967) (deposition containing inadmissible hearsay properly dis-

regarded). Conclusory statements or indications of opinion or belief offered without any factual support are also insufficient to create a genuine issue of fact. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079 (7th Cir.1992); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481 (7th Cir.1991); *Davis v. City of Chicago,* 841 F.2d 186, 189 (7th Cir.1988). "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of Du Page,* 715 F.2d 1238, 1243 (7th Cir.1983).

"Summary judgment is properly entered in favor of a party when the opposing party is unable to make a showing sufficient to prove an essential element of a case on which the opposing party bears the burden of proof." *Common v. Williams,* 859 F.2d 467 (7th Cir. 1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1032 (7th Cir.1988). The inquiry involved in ruling on a motion for summary judgment implicates the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at trial. *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2512. All factual inferences must be drawn in favor of the non-moving party. *Valley Liquors,* 822 F.2d at 659.

*Evidentiary Submission*

Marozsan has submitted a number of affidavits in opposition to defendants' motions. However, many of them do not, for various reasons, constitute admissible evidence and cannot, therefore, be considered by the court in determining the existence of a triable issue of fact. *Horta,* 4 F.3d at 8. Among the materials submitted by Marozsan are four affidavits by Sidney Cooper, the National Legislative Director of an organization called Veterans Due Process. Three of the affidavits authenticate and attest to the truth of attached statements which Cooper presented to the House and Senate Veterans Affairs Committees in 1988 and 1990. The fourth attempts to attest to the veracity of attached testimony by Dr. Alcide Pellerin before the Senate Committee on Veterans Affairs. The first three Cooper statements amount to little more than collections of argumentative and conclusory assertions, and there is no indication that the statements and opinions expressed by Cooper in his testimony before Congress were based upon personal knowledge. *See Resolution Trust Corp. v. Juergens,* 965 F.2d 149, 152–53 (7th Cir.1992). Cooper's fourth affidavit, which purports to attest to the truth of testimony by Dr. Pellerin, is hearsay. Cooper's affidavits, accordingly, are not admissible.

In addition, Marozsan has submitted the affidavit of Philip E. Cushman, President of Veterans Due Process, Inc. But Cushman's affidavit, like those of Cooper, is composed of general complaints, arguments and conclusory statements, unsupported by specific facts and unaccompanied by a demonstration of personal knowledge. Consequently, the Cushman affidavit is inadmissible.

Marozsan has also introduced an affidavit by Rick Paradise, his "Expert Computer Mathematical analyst," in support of his theory that the V.A. utilizes a quota system in rating disabilities. Paradise's affidavit, however, merely states that he is "willing to testify that [he] has produced the Statistical Graphical Illustrations and Curvings for Steven S. Marozsan's Exhibits as viable proof's [sic] of the existences of a 'QUOTA SYSTEM' DEPLOYED BY THE DEFENDANT'S [sic], The Veterans Administration and its Officers." Paradise further states that his " 'particularized' Statistic's [sic] were taken from the Numerical Stats" provided to Marozsan by the V.A.; that he used the information "for [his] Computers;" and that "[t]he graphical computer output is a DIRECT RELATIONSHIP to the Defendant's [sic] annual assignments of Degree's [sic] in Disabilities granted by the defendant's [sic] by Regional Rating Boards throughout the United States." The affidavit concludes by noting that Paradise's "analysis was performed on an IBM–AT Computer using the Quattro–Pro Program by Borland International."

■ It is well-established that facts and opinions contained in an expert's deposition or affidavit may only be considered if they would be allowed in evidence under the Federal Rules of Evidence. *Porter v. Whitehall Laboratories, Inc.,* 791 F.Supp. 1335, 1342 (S.D.Ind.1992), *aff'd.,* 9 F.3d 607 (7th Cir. 1993). While "[c]oherent facts and opinions stated by an expert may meet the standard of relevance provided by Rule 401 of the Federal Rules of Evidence, [they] may be held inadmissible if they run afoul of some other Rule." *Id.* Before an expert's testimony will be found admissible, three independent tests must be satisfied. First, it must be shown that the proposed expert witness is "qualified as an expert by knowledge, skill, experience, training or education." Fed.R.Evid. 702. Second, the court must find that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the facts or data "upon which an expert bases an opinion or inference ... [must] be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. *See Daubert v. Merrell Dow Pharmaceuticals Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Porter,* 791 F.Supp. at 1342.

■ In this case, the affidavit of Rick Paradise fails to demonstrate his qualifications as an expert either by knowledge, skill, experience, training, or education, as required by Fed.R.Evid. 702. Although Paradise's signature is followed by a list of his employers, along with his dates of employment and job titles, this information is insufficient to establish his qualifications to render an expert opinion with respect to the significance of statistics and the performance of statistical analyses by computer. While it is apparent that expert testimony would be required to demonstrate the significance of the raw data supplied to Marozsan by the V.A., nothing in Paradise's affidavit indicates that the facts or data upon which he bases his opinion is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. In short, the affidavit and testimony of Rick Paradise is inadmissible.

Further, the affidavit of John T. Altiery, which refers to alleged errors and misconduct on the part of the V.A. with respect to the processing and adjudication of his own claim for benefits, has no tendency to prove any fact in issue in this case. The affidavit of J. Howard Newman, moreover, contains conclusory statements regarding the use of quotas and other misdeeds by the V.A., but contains no specific facts to support such claims and makes no showing that the affiant's general statements are based upon personal knowledge. These affidavits, accordingly, cannot be considered in determining the existence of a triable issue of fact.

### *Constitutionality of 38 U.S.C. § 211(a)*

■ In his third amended complaint, Marozsan continues to challenge the constitutionality of 38 U.S.C. § 211(a), ignoring the fact that the Seventh Circuit previously affirmed "the portion of the district court's opinion granting summary judgment in favor of the defendants on Marozsan's equal protection challenge to § 211(a)." *Marozsan,* 852 F.2d at 1471, n. 3. The Court of Appeals also construed § 211(a) "to allow substantial constitutional challenges to the Veterans' benefits statutes and regulations, as well as to the procedures established by the V.A. to administer them," *Id.* at 1472, and expressly noted that it was adopting this construction of the statute "[t]o preserve its constitutionality." *Id.* Section 211(a), accordingly, is constitutional as construed. *See Johnson v. Robison,* 415 U.S. 361, 367, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974); *Rosen v. Walters,* 719 F.2d 1422, 1423 (9th Cir.1983); *Anderson v. Veterans Administration,* 559 F.2d 935, 936 (5th Cir.1977); *Cooper v. The United States of America,* 1989 WL 71213, 1989 U.S.Dist. LEXIS 6924 (S.D.N.Y. June 23, 1989). Defendants are thus entitled to summary judgment on Marozsan's challenges to the constitutionality of § 211(a).

### *Claims for Damages and Benefits Against United States, V.A., and V.A. Employees in Their Official Capacities*

■ In Count I of the third amended complaint, Marozsan demands "an award of

Money Damages ... in the sum of money equal to ... [his lost] property interest ... to be not less than One Million Dollars, plus interest, plus all costs the plaintiff has had to bare [sic] for his thirty-nine years...." He asks the court "to direct the Defendants to retroactively compensate [him] ... back to ... May 29, 1953 [and find] that all such retroactive compensation payments be made at the proper and statutorily required 100% rating in his Service Connected Spinal Disability." (Third Amended Complaint, p. 11). The Court of Appeals, however, has already determined that § 211(a) precludes judicial review of the V.A.'s determination of benefit and disability levels:

> In addition to asking for V.A. compliance with the due process clause, Marozsan sought retroactive benefits, restoration to his proper level of disability, and $5 million in damages. Section 211(a) clearly precludes all review of the Administrator's decision to set benefits and disability levels, *Winslow v. Walters,* 815 F.2d 1114, 1117 (7th Cir.1987), and 28 U.S.C. § 1346(a)(2) precludes a district court from hearing claims against the United States for more than $10,000. We therefore affirm that portion of the district court's opinion dismissing these claims for lack of subject matter jurisdiction.

*Marozsan,* 852 F.2d at 1471, n. 3. This court, accordingly, has no authority "to change the V.A.'s decisions regarding disability ratings and entitlement to benefits." *Id.* at 1473, n. 10; *see Deloria v. Veterans Administration,* 927 F.2d 1009, 1013 (7th Cir. 1991); *Mathes v. Hornbarger,* 821 F.2d 439, 440 (7th Cir.1987).

▇▇▇▇ Under Count II of his third amended complaint, Marozsan seeks damages against the United States for the alleged constitutional torts of its employees, based on a theory of *respondeat superior.* This claim is precluded by the doctrine of sovereign immunity. "It long has been established, ... that the United States, as sovereign, 'is immune from suits save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Mitchell,* 463 U.S. 206, 212,

103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) (quoting *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941)); *Fostvedet v. U.S.,* 978 F.2d 1201, 1202–03 (10th Cir.1992). The United States has not waived its sovereign immunity with respect to damage claims for constitutional violations. *Clemente v. United States,* 766 F.2d 1358, 1363 (9th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 881, 88 L.Ed.2d 917 (1986); *Radin v. United States,* 699 F.2d 681, 684–85 (4th Cir.1983); *Laswell v. Brown,* 683 F.2d 261, 268 (8th Cir.1982), *cert. denied,* 459 U.S. 1210, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983); *United States v. Timmons,* 672 F.2d 1373, 1380 (11th Cir.1982); *Garcia v. United States,* 666 F.2d 960 (5th Cir.1982), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982). While *Bivens* authorizes damage suits against individual federal officials, it does not authorize such suits against the United States, its agencies, or its employees in their official capacities. *Pereira v. U.S. Postal Service,* 964 F.2d 873, 876 (9th Cir. 1992); *Thomas–Lazear v. Federal Bureau of Investigation,* 851 F.2d 1202, 1207 (9th Cir. 1988); *McCollum v. Bolger,* 794 F.2d 602, 608 (11th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987); *Hohri v. United States,* 782 F.2d 227, 245 (D.C.Cir.1986). "[T]he bar of sovereign immunity cannot be avoided by naming officers and employees of the United States as defendants." *Gilbert v. DaGrossa,* 756 F.2d 1455, 1458 (9th Cir.1985); *Clark v. Library of Congress,* 750 F.2d 89, 103 (D.C.Cir.1984). Marozsan's claims for monetary damages and benefits against the United States, the V.A., and any V.A. officers or employees in their official capacities must, accordingly, be dismissed under Fed.R.Civ.P. 12(b)(1), for lack of jurisdiction over the subject matter.

### Use of Quota System in Processing Benefit Claims

Since the filing of his original complaint in 1984, Marozsan has maintained that the V.A. employs a quota system which arbitrarily limits the number of claims granted. In his third amended complaint, he alleges that

[b]y operating an internal system of 'Production Quotas' and Bonuses and other Awards, some as high as an increase or bonus of $5,000 per year, has encouraged all V.A. Officer and Employees involved in Marozsan's case to deny him his service connected spinal disability all the way back to May, 1953.

(Third Amended Complaint, Count I, ¶ 30, p. 9.)

During his deposition, Marozsan identified four types of quotas which he claimed the V.A. had employed: "national quotas," "regional quotas," "production quotas," and "quotas on the assignment of the varying degrees or disabilities assigned by regional rating officers." (Marozsan deposition, February 6, 1992, p. 110.) According to Marozsan,

[t]he national quotas are all of the claims that are sent or are before the Board of Veterans' Appeals annually, the total number annually before that board. In those totals, the BVA procedures and statistics, which we have all these statistics, is broken down into number of claims allowed, number of claims denied, and number of claims remanded, and number of claims— which in their—in their charts, they just put down 'miscellaneous.' That could be anything.

(Marozsan deposition, February 6, 1992, p. 111.)

When asked to identify all documents supporting the existence of national quotas, Marozsan produced tables of statistics (Marozsan deposition, Ex. C) from an unidentified issue of the Disabled American Veterans magazine, purportedly showing the "number of claims that had been allowed by the BVA to national veterans' service organizations for their representations." (Marozsan deposition, p. 113.) Marozsan also produced a set of documents containing statistics which had been provided to him by the V.A. during discovery (Marozsan deposition, Group Ex. B), along with a 1977 letter apparently authored by a former BVA staff attorney, Norman J. Johnson, describing the existence of a covert quota system under which job performance of staff attorneys was rated by the

number of decisions written in a given week. (Marozsan deposition, p. 111–121; Ex. D.)

Upon being asked what he meant by a regional quota, Marozsan stated: "Again, each region is issued orders by the VA central office that the adjudication officers are to only allow a fixed number of claims to be granted. They have their regional quotas that they have to abide by." According to Marozsan, such quotas were made known "through interoffice memorandums that we are not privileged to have." (Marozsan deposition, pp. 121–22.) Marozsan testified, however, that statistics supporting the existence of regional quotas were attached to his deposition of November 28, 1989, as Exhibit UUUU. (Marozsan deposition, Feb. 6, 1993, pp. 121–23.)

Marozsan testified that what he had described as

production quotas [were] upon instructions in the adjudication manuals directing all adjudication officers and employees that they are given x-number of minutes or hours in which they have to render decisions in a veteran's case. They have to maintain certain production levels each and every year in order for them to qualify for bonuses. If they don't meet those production quotas, they don't get no bonus.

(Marozsan Deposition, Feb. 6, 1992, p. 124.) When called upon to identify those documents showing the existence of "production quotas," Marozsan referred to a "secret adjudication" manual, which is "issued by the 'central V.A. office' to all regional adjudicators" (Marozsan deposition, Feb. 6, 1992, pp. 125–126), along with three newspaper articles from the *New York Times* (Marozsan Deposition, pp. 124–131, Exs. E, F and G.)

The fourth type of quota, according to Marozsan, involved the manipulation of the disability ratings assigned to individual veterans in order to keep down or control the amount of benefits awarded. (Marozsan Deposition, pp. 132–138.) Marozsan indicated that his proof of such quotas was derived from his analysis of his own case and his review of files which had been sent to him by other veterans. (Marozsan Deposition, pp. 134–138.) Marozsan further stated that he did not have any statistical proof regarding

the existence of rating quotas, but intended to prove his claims at trial by present evidence on what the V.A. had done in rating other veterans around the nation, as well as himself. (Marozsan Deposition, p. 139.)

██ Marozsan's proof fails to demonstrate a triable issue of fact with respect to the existence or effect of any of the alleged quotas. His deposition testimony about the four types of quotas consists of inadmissible hearsay and bare speculation. The statistics produced by the V.A. during discovery contain no reference to any type of "quota" and the significance of the data in terms of demonstrating the existence or use of some type of "quota" is not otherwise apparent. The document containing statistical information from an unidentified issue of the DAV magazine, as well as the three newspaper articles and the letter from Norman J. Johnson, represent inadmissible hearsay. *See Horta,* 4 F.3d at 8. The affidavit of Marozsan's "expert," Rick Paradise, is also inadmissible, as previously discussed because it does not contain a threshold showing of his qualifications to render the opinions expressed, as required by Fed.R.Evid. 702, and that the data upon which he relies is of a type relied upon by experts in the field to form opinions on the subject, as required by Fed.R.Evid. 703. In essence, Marozsan's longstanding claims regarding the existence and use of quotas in the V.A.'s adjudicatory process are wholly unsupported by any admissible evidence of record. Defendants, accordingly, are entitled to summary judgment on all of his "quota" claims.

### Alleged Violations of Regulations and Attacks on Adjudication of Marozsan's Claim

██ Marozsan also alleges that the V.A. violated a number of its rules or regulations in adjudicating his benefits claim and that certain V.A. "practices" violated his right to due process. These allegations are essentially challenges to the V.A.'s application of the law to the facts of his particular claim, consideration of which is precluded by § 211(a). *See e.g. Larrabee by Jones v. Derwinski,* 968 F.2d at 1500. In this regard, the third amended complaint challenges "[t]he practice

of falsely adjudicating that when the plaintiff with a long standing claim at last succeeded in their system, that this had been on the basis not by a V.A. error, but alleged 'new Evidence,' which was nothing more than repetitious evidences antedating back to the 1st BVA Error in 1954;" and that the defendant's [sic] again had to violate one of their own M21-1 Adjudication Orders, demanding that such Errors be applied the 'Equitable Relief' Doctrine, 38 U.S.C., Section 210(c)(3)(A)(2)." (Third Amended Complaint, Count I, ¶ 24, p. 8.) It is also alleged that

> [a]nother method of deceits with intent to defraud in the defendant's arsenals is a 'Catch 22' whereby the V.A. would then invoke another internal order in their Adjudication Manual, M21-1 . . . which automatically, arbitrarily and capriciously reduces that veteran's disability compensations and or pensions and as a 'PUNISHING STATUTE' FOR SUCCESSFULLY PERSEVERING AGAINST THEIR SYSTEMS OF DECEITS AND FRAUDS.

(Third Amended Complaint, Count I, ¶ 25, p. 8.) Marozsan further claims that

> a system where non-licensed medical doctors, retired military doctors, retired general practitioners and non-qualified medically Rating Specialists sitting on Rating Boards, on the Board of Veterans Appeals, rendering adverse decisions against the plaintiff in ludicrous, absurd oppositions to the plaintiff's submitted outside 'Expert, Orthopedic Surgeon's Affidavates [sic], Expert Neurosurgeon Affidavates [sic], in oppositions to the plaintiff's early childhood family doctor, against his own family doctor's affidavates [sic], is still another violation of 38 C.F.R., Section 3.156(2); this is another Due Process violations [sic] and denialments of the plaintiff's property interests rights.

(Third Amended Complaint, Count I, ¶ 31, p. 10.) Further, Marozsan alleges that "[t]he evidences of 'Living first hand Military witnesses' by affidavates [sic], were over-ridden to uphold pre-determined denials," as further proof of "defendant's pre-conceived conspiracies to deceive and defraud the plaintiff, is ad infinitum of rules, regulations violations by

the defendant's [sic] and Due Process of Law violation." (Third Amended Complaint, Count I, ¶ 32, p. 10.) These attacks upon the adjudication of Marozsan's particular claim, some of which are thinly disguised as challenges to the constitutionality of certain alleged V.A. practices, are clearly barred by § 211(a), which precludes "those actions that challenge the V.A.'s application of benefits laws to specific fact situations."[5] *Marozsan,* 852 F.2d at 1475. *See Johnson,* 415 U.S. at 367, 94 S.Ct. at 1166; *Devine v. Cleland,* 616 F.2d 1080, 1083–85 (9th Cir.1980). To the extent that these allegations can be construed as genuine challenges to the constitutionality of the V.A.'s established practices or procedures and not just the method used by the V.A. in deciding Marozsan's particular claim, he has submitted no admissible evidence suggesting any constitutional violation. Consequently, defendants are entitled to summary judgment on these claims.

*"Whole Man Theory" and "Diagnostic Codes of Ratings"*

Marozsan also challenges "the use of a method of disability ratings known as the 'diagnostic codes of ratings,'" as well as the V.A.'s use of what he calls the "'whole man theory' of combining ratings." (Third Amended Complaint, Count I, ¶ 26, pp. 8–9.) The "diagnostic codes of ratings," which are described in 38 C.F.R. § 4.27, are a series of arbitrary four digit numbers assigned to particular disabling conditions listed in the V.A.'s Schedule for Rating Disabilities in 38 C.F.R. Part 4, App. B. There is nothing to indicate that these numbers serve any purpose other than that of a reference device, and there is nothing to suggest that they have any substantive effect on the assignment of disability ratings or the adjudication of benefits claims.

What Marozsan refers to as the "whole man theory" is codified at 38 C.F.R. § 4.25, which includes the Combined Ratings Table. It is concerned with the method by which the V.A. calculates ratings for veterans suffering from multiple service-connected disabilities. According to § 4.25, the Combined Ratings Table

results from the consideration of the efficiency of the individual as affected first by the most disabling condition, then by the less disabling condition, then by other less disabling conditions, if any, in the order of severity. Thus, a person having a 60 percent disability is considered 40 percent efficient. Proceeding from this 40 percent efficiency, the effect of a further 30 percent disability is to leave only 70 percent of the efficiency remaining after consideration of the first disability, or 28 percent efficiency altogether. The individual is thus 72 percent disabled ... To use [the Table] the disabilities will first be arranged in the exact order of their severity, beginning with the greatest disability and then combined with use of [the Table] as hereinafter indicated. For example, if there are two disabilities, the degree of one disability will be read in the left column and the degree of the other in the top row, whichever is appropriate. The figures appearing in the space where the column and row intersect will represent the combined value of the two. This combined value will then be converted to the nearest number divisible by 10, and combined values ending in 5 will be adjusted upward. Thus, with a 50 percent disability and a 30 percent disability, the combined value will be found to be 65 percent, but the 65 percent must be converted to 70 percent to represent the final degree of disability.

Marozsan has failed to demonstrate any violation of his constitutional rights arising

---

**5.** Marozsan has also submitted an affidavit by P. Robert Rigney, Jr. The affidavit states that Rigney was formerly a District Field Representative for then Congressman John Bradamas, from 1975 to 1979 and that he had occasion to review Marozsan's V.A. records, research V.A. regulations pertaining to Marozsan's service-connected disability benefits, and prepare a written memorandum which was introduced at Marozsan's hearing before the BVA on September 11, 1979.

After discussing the evidence pertaining to Marozsan's disability claim, Rigney concludes by expressing his opinion "that the law and facts in this claim established that Mr. Marozsan was entitled to service-connected disability benefits." The Rigney affidavit, in essence, is merely another invitation for the court to review the V.A.'s determination of Marozsan's claim for benefits. Again, such a review is prohibited by § 211(a).

out of the V.A.'s application of § 4.25 and Combined Ratings Table. He has only one disability which has ever been rated as service-connected, and there is no indication that the Combined Ratings Table has ever been applied in the processing or adjudication of his claim.

■ Any facial challenge to § 4.25 and the Combined Ratings Table must also fail. The promulgation of regulations establishing methods for calculating disability ratings for multiple service-connected disabilities is clearly within the rulemaking authority of the Administrator (now the Secretary) of Veterans Affairs. In this regard, 38 U.S.C. § 1155 provides that

> [t]he Secretary shall adopt and apply a schedule of ratings of reductions in earning capacity from specific injuries or combination of injuries. The ratings shall be based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations. The schedule shall be constructed so as to provide ten grades of disability and no more, upon which payments of compensation shall be based, namely, 10 percent, 20 percent, 30 percent, 40 percent, 50 percent, 60 percent, 70 percent, 80 percent, 90 percent, and total, 100 percent.

Further, 38 U.S.C. § 1157 states:

> The secretary shall provide for the combination of ratings and pay compensation at the rates prescribed in subchapter II of this chapter [38 U.S.C. §§ 1110 *et. seq.* ] to those veterans who served during a period of war and during any other time, who have suffered disability in line of duty in each period of service.

■ To establish a due process violation, Marozsan faces the formidable burden of showing that the V.A.'s method of combining ratings lacks a rational basis. *See Weinberger v. Salfi,* 422 U.S. 749, 768, 95 S.Ct. 2457, 2468, 45 L.Ed.2d 522 (1975). "Moreover, that rational basis need not be expressed explicitly by Congress or the administrative agency; 'any state of facts reasonably may be conceived to justify it.'" *Dotson v. Shalala,* 1 F.3d 571, 580 (7th Cir.1993) (*quoting Dandridge v. Williams,* 397 U.S.

471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (citation omitted)).

■ Here, the calculation method prescribed in 38 C.F.R. § 4.25 and the Combined Ratings Table provide a uniform means of combining multiple disability ratings after ratings have been assigned to individual disabling conditions. Moreover, as defendants point out, the method rests upon the reasonable premise that the effect of additional disabilities is not purely cumulative; rather additional disabilities of an equal or lesser degree of severity serve to reduce on a proportionate basis the remaining efficiency of the individual. It is further apparent that the calculation method also does not preclude a "total" or 100 percent disability rating. The Schedule for Rating Disabilities, 38 C.F.R. Part 4, calls for the assignment of a total or 100 percent rating for a number of listed conditions. In addition, 38 C.F.R. § 4.15 provides for the assignment of a total disability rating where an impairment would render it impossible for the average person to follow a substantially gainful occupation. More still, 38 C.F.R. § 4.16(a) provides for the assignment of total disability ratings for compensation, even where the schedular rating is less than total, "when the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities [and certain minimum rating requirements are established]." Under these circumstances, the court cannot say that the method adopted by the Secretary for calculating the combined effect of multiple ratings is arbitrary or without rational justification. *See Heckler v. Campbell,* 461 U.S. 458, 466, 103 S.Ct. 1952, 1957–58, 76 L.Ed.2d 66 (1983); *Dotson,* 1 F.3d at 580.

*Discrimination Based Upon Type of Injury*

The third amended complaint also alleges that Marozsan's disability was improperly rated because he "fitted into one of [the V.A.'s] '(special Categories of Injuries),' diseases or disorders, namely those which the general public could not view with their naked eyes, and which would not outrage or inflame public opinions." (Third Amended Complaint, Count I, ¶ 33.) This resembles

an equal protection claim. However, Marozsan has presented no evidence that the V.A. draws such a distinction among disabilities. Defendants are thus entitled to summary judgment on this claim as well.

### Remaining Claims Against United States and V.A.

Marozsan's remaining claims raise a variety of grievances concerning allegedly illegal or improper V.A. actions and procedures, but the court finds them all to be either frivolous or otherwise lacking in merit.

### A. "Fiduciary" Relationship and False Testimony by V.A. Officials Before Congress

Marozsan alleges that "[b]etween the plaintiff and the V.A. there existed a fiduciary relationship, with the V.A. in the dominant role and the plaintiff in the subservient role," and that "[d]uring all this relevant period the Defendant VA made knowing and calculated false representations to the plaintiff, to the nation's veterans and before the House and Senate Veterans Affairs Committees." Such "false representations," according to the complaint, included claims that the V.A. was "the friend and ally of all veterans" in all matters with respect to claims; that the V.A.'s adjudicatory system for claims was " 'Impartial and Non–Adversarial' to veterans," including the plaintiff; that "any independent judicial or other review of V.A. Decisions would force the V.A. to Adopt an Adversarial role towards veterans, instead of its present fiduciary role;" that the Board of Veterans' Appeals adjudication system was the " 'FAIREST SYSTEM IN HANDLING VETERAN'S CLAIMS FOR BENEFITS;' " that within the V.A.'s present adjudicatory system "veterans are given a better chance to prevail in their Claim then [sic] they would have if any Court or Official had the power to review, re-examine cases;" and that the V.A. will often consider an act on inadmissible evidence in favor of a veteran's claim and allow it despite admissible evidence against the veteran. (Third Amended Complaint, Count I, ¶ 8, p. 4.) It is further alleged that these and many more "false, competent lies" were contained in the testimony of unidentified "V.A. Officers" before the House Veter-

ans Affairs Committee during various hearings held between 1978 and 1988, and that the communication of such lies to the "news medias [sic] resulted in the defeat or emasculation of numerous Reform Bills from 1978 to 1988, which would have allowed the passages [sic] of 'unconditional Judicial Review Legislation,' such as H.R. 585, and Senate Bills (S–11)...." (Third Amended Complaint, Count I, ¶ 9, pp. 4–5.) As a consequence, according to Marozsan

the V.A. now stands estopped to deny the truths of the existence of this fiduciary relationship of trust and confidence and of the fiduciary role and relationship they have so long maintained and held Marozsan totally powerless to stop the defendants ultimate end objectives, which always were to Deceive and Defraud the plaintiff and as many specially targeted Claimant's [sic] from receiving the Entitlements and Benefits....

(Third Amended Complaint, Count I, ¶ 10, p. 5.)

There is no such thing as a "fiduciary relationship" between the V.A. and veterans. The "relationship" between the V.A. and veterans, rather, is defined by the Constitution, statutory authority provided by Congress, and regulations promulgated by the V.A., none of which give any hint of such a "fiduciary relationship." More still, there is nothing to suggest that the generalized representations of V.A. officials in their testimony before the House Veterans Affairs Committee caused the defeat of reform legislation, or otherwise influenced congressional action, and Marozsan's claim that defendants are somehow "estopped to deny" such a fiduciary relationship is patently frivolous.

Ultimately, it is clear that Marozsan lacks Article III standing to sue the V.A. for the actions of its officials in testifying before Congress. The doctrine of standing serves to identify those disputes which fulfill the case-or-controversy requirement of Article III of the Constitution, which defines and limits the jurisdiction of federal courts. *Northeastern Florida Contractors v. Jacksonville*, —— U.S. ——, ——, 113 S.Ct. 2297, 2301, 124 L.Ed.2d 586 (1993); *Whitmore v.*

*Arkansas,* 495 U.S. 149, 154–55, 110 S.Ct. 1717, 1722–23, 109 L.Ed.2d 135 (1990); *Banks v. Secretary of Indiana Family & Soc. Serv.,* 997 F.2d 231, 237 (7th Cir.1993). To satisfy the constitutional requirements of standing, a plaintiff seeking to invoke federal jurisdiction must, at a minimum, establish three elements:

> First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally-protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' . . . Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' . . . Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

*Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (alterations in original) (citations omitted); *see Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); *Harp Advertising Illinois, Inc. v. Village of Chicago Ridge, Illinois,* 9 F.3d 1290 (7th Cir.1993); *Banks,* 997 F.2d at 238.

■ In addition to these constitutional requirements, the Supreme Court has recognized certain prudential principles which bear upon the question of standing. Thus, the court has held that " 'the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). Further, even when a plaintiff has alleged a redressible injury, the court has "refrained from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed to the representative branches." *Id.* 454 U.S. at 475, 102 S.Ct. at

760 (quoting *Warth,* 422 U.S. at 499–500, 95 S.Ct. at 2205–06)); *see Apache Bend Apts. v. U.S. through I.R.S.,* 987 F.2d 1174, 1176 (5th Cir.1993).

■ It must also be noted that the party invoking federal jurisdiction bears the burden of establishing the constitutional elements of standing. *Lujan,* —— U.S. at ——, 112 S.Ct. at 2136; *Warth,* 422 U.S. at 508, 95 S.Ct. at 2210. Moreover, since the constitutional elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan,* —— U.S. at ——, 112 S.Ct. at 2136. *See Gonzales v. North Tp. of Floyd County, Ind.,* 4 F.3d 1412, 1415 (7th Cir.1993).

Marozsan claims to have been injured by the conduct of certain V.A. officials in giving false testimony during hearings before Congress on a bill which, if passed, would have provided for judicial review of V.A. benefit determinations. However, neither the giving of false testimony before Congress, nor the failure of Congress to pass a law establishing a mechanism for judicial review of benefit claims, could have violated any legally protected interest held by Marozsan. Further, there is no causal connection between any injury to Marozsan and the giving of false testimony by V.A. officials. It is, indeed, pure conjecture to suppose that the testimony of V.A. officials, as alleged, influenced any congressional action or, even if it did, that the passage of legislation providing for judicial review would have led to any different or more favorable outcome for Marozsan's disability benefits claim. In addition, there is no possibility, let alone a likelihood, that any injury to Marozsan could be redressed by a favorable decision in this case. Even if the court were to find that V.A. officials presented false testimony during the hearings on H.R. 585 [99th Cong., 1st Sess. § 302(a) (1985)], and even if it were to also find that this contributed to cause the defeat of the bill, the court would be without authority to

mandate passage of the legislation. Consequently, Marozsan lacks standing.

### B. "Symbiotic" Relationship between V.A. and National Veterans Service Organizations

Marozsan also complains about the existence of a so-called "symbiotic" financial relationship between the V.A. and national veterans service organizations ("NVSOs") like the American Legion, Veterans of Foreign Wars and Disabled American Veterans.[6] In this respect, Paragraph 15 of the second amended complaint previously alleged "that space and facilities are provided to the service organizations by the Veterans Administration, making the service organizations subject to 'blackmail' regarding threats to terminate this assistance." During his deposition testimony, Marozsan referred to a letter sent by V.A. officials to the national commanders of all NVSOs prior to the June 24, 1986 congressional hearings on H.R. 585, a bill which would have provided for judicial review of V.A. benefit determinations. (Marozsan Deposition taken Nov. 28, 1989, pp. 55–82, 150 and 158.) The letter (Deposition Ex. H) enclosed a document entitled "Overview of V.A.'s Position on Judicial Review," which presented various criticisms of the bill. The position statement cautioned that:

> many special considerations currently extended to veterans service organizations may have to be curtailed. The providing of V.A. space and facilities, informal access to adjudicatory personnel, etc., could be affected by judicial oversight and increased representation by private attorneys.

Following the dissemination of the letter and position statement, according to Marozsan, a number of NVSOs which had been favoring or supporting judicial review suddenly reversed their positions, and ultimately the bill died in committee. As further evidence of the existence of the alleged "symbiotic" relationship between the V.A. and the NVSOs, Marozsan, in his deposition testimony, cited the donation of a computer system to the V.A. by the Disabled American Veterans, supposed "trade-offs" of claims by the V.A. and the NVSOs, and what he termed "revolving door" employment between the V.A. and the NVSOs.

Again, the court must conclude that Marozsan lacks standing. First, he has not suffered any "injury in fact"—the invasion of a legally-protected interest which is concrete and particularized—resulting from the V.A.'s 1986 letter (he has had no claim for benefits pending since 1984) or the purported "symbiotic" relationship between the V.A. and the NVSOs. Second, any connection between the V.A.'s dissemination of the letter or the existence of a "symbiotic" relationship and any change in the position of the NVSOs with respect to H.R. 585, and ultimately the defeat of H.R. 585, is based upon nothing more than Marozsan's own speculation. No causal connection between any injury and the conduct complained of has been shown. Third, there is again no possibility that Marozsan's claimed injury could be redressed by a favorable decision; the court has no legislative authority under the Constitution.

### C. Preferential Treatment

██ Marozsan further claims that veterans who are constituents of influential members of Congress who sit on House and Senate Veterans Affairs Committees have received preferential treatment in violation of the Fourteenth Amendment. (Third Amended Complaint, Count I, ¶ 19.) Marozsan, however, has not shown how this preferential treatment, if any, had any adverse effect on his disability benefits claim. No violation of his constitutional rights has been demonstrated.

It is also apparent that Marozsan lacks standing to raise this claim, as well. Once again, he has demonstrated no direct injury to any legally protected interest as a result of the challenged action or conduct. In addition, there is no evidence or indication of any connection between an injury to any protected interest held by Marozsan and preferential treatment accorded to certain veterans. Further, it might be possible for the court to order the V.A. to refrain from according preferential treatment to certain veterans, but any such order would do more than

---

6. The V.A. permits recognized veterans' service organizations to represent claimants during V.A. proceedings. 38 C.F.R. §§ 14.626; 14.627; 14.628.

require the V.A. to desist from unauthorized or unethical action. Marozsan's complaint in this instance actually amounts to nothing more than a generalized protest about governmental misconduct. As the Supreme Court observed in *Lujan*

> a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy

—— U.S. at ——, 112 S.Ct. at 2143. *See, e.g., Whitmore,* 495 U.S. at 160, 110 S.Ct. at 1725; *Allen,* 468 U.S. at 754, 104 S.Ct. at 3326; *Valley Forge,* 454 U.S. at 482–83, and 489–90, n. 26, 102 S.Ct. at 763–64 and 767–68, n. 26.

### D. *Discovery Abuse*

The third amended complaint further alleges that the defendants have failed or refused to comply with Marozsan's discovery requests. This claim is frivolous. There is no recognized civil cause of action for the failure or refusal of a party to provide discovery. Rule 37 of the Federal Rules of Civil Procedure, not a separate lawsuit, represents the proper and available remedy for an adversary's non-compliance with discovery requests. *See Liberty Leather Corp. v. Callum,* 653 F.2d 694, 700 (1st Cir.1981); *Countryside Cas. Co. v. Orr,* 523 F.2d 870 (8th Cir.1975).

### E. *Denial of Effective Assistance of Counsel*

Marozsan also alleges that the V.A. "denied ... his right to the assistance of Legal Counsel by the capping of attorney fees at $10.00 maximum allowed." (Third Amended Complaint, Count I, ¶ 13, p. 6.) This is an apparent reference to 38 U.S.C. § 3404(c) (now codified as amended at 38 U.S.C. § 5904(c)), which limited the fee a veteran or his survivor was permitted to pay an attorney for prosecuting a claim before the V.A. to $10.[7] But, in *Walters v. National*

*Ass'n of Radiation Survivors,* 473 U.S. 305, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985), the Supreme Court held that the $10 attorney fee limitation was not unconstitutional on its face and violated neither the Due Process Clause of the Fifth Amendment nor the rights of veterans under the First Amendment. *Id.* at 334–35, 105 S.Ct. at 3196–97; *see National Association of Radiation Survivors v. Derwinski,* 994 F.2d at 583; *see also Bahnmiller v. Derwinski,* 923 F.2d 1085 (4th Cir.1991). While the court in *Walters* may have left open the possibility of a constitutional attack on the fee limit as applied, *see Id.* at 337, 105 S.Ct. at 3198 (O'Connor, J., concurring), Marozsan has produced no evidence to support a claim that application of the fee limitation in his particular case violated his constitutional rights.

### F. *Denial of Access to the Courts*

Marozsan further alleges that he has suffered

> [a] fundamental denial of Justice, Due Process and Equal Protections of the Laws, as these have been understood in our system since the days of Magna Carta, by denying the plaintiff to our Courts of Justice open to all other citizens, is contrary to the First Amendment to the U.S. Constitution.

(Third Amended Complaint, Count I, ¶ 19, p. 7.) By this, Marozsan appears to be claiming that 38 U.S.C. § 211(a), which formerly precluded judicial review of individual claim determinations, violated his First Amendment right of access to the courts. The absence of judicial review of V.A. determinations, however, does not equate with the First Amendment guarantee of meaningful access to the courts. The right of access does not mandate jurisdiction where none exists or the creation of a cause of action which has not been recognized. Marozsan has always had access to the courts, though the courts may not have had jurisdiction over the particular claim he wished to press.

---

**7.** The $10 limitation was removed by amendment and replaced by a flat prohibition against payment of a fee for services provided by agents and attorneys prior to the date on which the Board of Veterans Appeals first makes a final decision in the case. 38 U.S.C. § 5904(c)(1).

### Availability of Bivens Remedy

Marozsan cannot maintain a *Bivens* action against any of the individual defendants. In *Bivens,* the Supreme Court held that the victim of a Fourth Amendment violation committed by federal officers acting within the scope of their authority could maintain an action under federal law for money damages against the individual officers. 403 U.S. at 389, 91 S.Ct. at 2001. At the same time, though, the court noted that the case did not involve "special factors counseling hesitation in the absence of affirmative action by Congress." *Id.* at 396, 91 S.Ct. at 2004. The Supreme Court has since recognized similar actions for money damages against federal officers based upon a violation of the Due Process Clause of the Fifth Amendment, *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), as well as the Cruel and Unusual Punishments Clause of the Eighth Amendment, *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). However, "[i]n each of these cases, as in *Bivens* itself, the Court found that there were no 'special factors counseling hesitation in the absence of affirmative action by Congress,' no explicit statutory prohibition against the relief sought, and no exclusive statutory alternative remedy." *Schweiker v. Chilicky,* 487 U.S. 412, 421, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (citations omitted).

More recent decisions by the Supreme Court "have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts," *Chilicky,* 487 U.S. at 421, 108 S.Ct. at 2467, and the court has pointed out that "[t]he absence of statutory relief for a constitutional violation, for example, does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." *Id.* Accordingly, in *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the court refused to create a *Bivens* action for enlisted military personnel who alleged that they had been injured by the unconstitutional action of their superior officers and who otherwise had no remedy against the government itself. Likewise, in *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), the court refused to create a

*Bivens* remedy for a government employee who alleged that he had been demoted for exercising his rights under the First Amendment. The court concluded that the administrative system created by Congress provided "meaningful remedies for employees who may have been unfairly disciplined for making critical comments about their agencies," *Id.* at 386, 103 S.Ct. at 2414 (footnote omitted), notwithstanding that "existing remedies [did] not provide complete relief for the plaintiff." *Id.* at 388, 103 S.Ct. at 2417. In so doing, the court explained that Congress was "in a better position to decide whether or not the public interest would be served by creating [such remedy]." *Id.* at 390, 103 S.Ct. at 2417 (citation omitted).

In *Chilicky,* the court declined to recognize a *Bivens* remedy for alleged due process violations in the denial of Social Security disability benefits. Upon reviewing its prior decisions, the court observed:

> In sum, the concept of 'special factors counseling hesitation in the absence of affirmative action by Congress' has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

487 U.S. at 423, 108 S.Ct. at 2468; *see Bricker v. Rockwell Int'l. Corp.,* 22 F.3d 871 (9th Cir.1993); *Jones v. Tennessee Valley Authority,* 948 F.2d 258 (6th Cir.1991); *McMillen v. United States Dept. of Treasury,* 960 F.2d 187 (1st Cir.1991); *Feit v. Ward,* 886 F.2d 838, 855 (7th Cir.1989).

In the present case, it is clear that Congress' failure to provide for a damage remedy against individual V.A. personnel, as well as the policies underlying the constraints upon judicial review imposed by § 211(a), militate even more strongly against the recognition of a *Bivens* remedy. "Allowing disgruntled veterans to sue V.A. employees who apply veterans legislation in the course of their duties would severely under-

mine Congress' intent in precluding judicial review of challenges to veteran's benefits legislation." *Sugrue v. Derwinski,* 808 F.Supp. 946, 951 (E.D.N.Y.1992). The court concludes that Marozsan has no claim to press under *Bivens.* His *Bivens* action is, accordingly, subject to dismissal with prejudice under Rule 12(b)(6), for failure to state a claim upon which relief can be granted.

### Absolute Immunity of V.A. Adjudicators

 With the exception of former V.A. Administrators Max Cleland and H.M. Walters, the third amended complaint indicates that the remaining *Bivens* defendants have been sued because of their involvement, at one time or another, in adjudicating Marozsan's claim for veterans' benefits. It is well-established, however, that administrative hearing officers are absolutely immune from damage claims arising out of their adjudicatory decisions, provided that there is some mechanism, such as an appeal process, for safeguarding the independence of their judgment. *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Sufficient safeguards are afforded applicants for veterans' benefits by an internal V.A. appeal process combined with the limited form of judicial review previously recognized by the Seventh Circuit in this case. As Judge Posner has already noted, a veteran's suit against the officials who denied his claim "would be barred by the absolute immunity of adjudicators." *Marozsan,* 852 F.2d at 1482 (Posner, J., concurring). *See Cochran v. Kozloski,* 1989 WL 39829, 1989 U.S.Dist. LEXIS 4149 (N.D.Ill. Apr. 19, 1989). Defendants A.P. Cowan, W.R. Gladding, M.D., P. Moncure, James F. Sponzo, R.L. Hornbarger, J. Higgins, Dr. B. Garnder and Sidney J. Shuman are entitled to summary judgment under the doctrine of absolute immunity.

### Dismissal Under Rule 4(j)

 Even if the court were to recognize a *Bivens* remedy against V.A. officials and employees, and even if those defendants involved in the adjudication of Marozsan's benefits claim were not cloaked with immunity, dismissal of the third amended complaint against the individual defendants would still be required because of Marozsan's failure to serve them within 120 days of the filing of the third amended complaint. Rule 4(j) mandates dismissal without prejudice if a defendant is not served with the summons and complaint within 120 days after the filing of the complaint, unless the plaintiff can show "good cause" why service was not made within that time. *Tso v. Delaney,* 969 F.2d 373, 375 (7th Cir.1992); *Powell v. Starwalt,* 866 F.2d 964, 965 (7th Cir.1989); *Geiger v. Allen,* 850 F.2d 330, 331–32 (7th Cir.1988). The purpose of the Rule is " 'to force parties and their attorneys to be diligent in prosecuting their causes of action.' " *Geiger,* 850 F.2d at 331 (quoting *Wei v. Hawaii,* 763 F.2d 370, 372 (9th Cir.1985)). Thus, the Rule has been held to apply "equally to defendants who were never served and defendants who were served after the 120–day period had lapsed." *Geiger,* 850 F.2d at 332. "Later service or later knowledge is irrelevant." *Id.* at 332, (quoting *Winters v. Teledyne Movible Offshore, Inc.,* 776 F.2d 1304, 1306 (5th Cir. 1985)); *see also McDonald v. United States,* 898 F.2d 466, 468 (5th Cir.1990). The requirement of proper service within that time period, moreover, is not waived by the entry of an appearance by or on behalf of a defendant. *Lewellen v. Morley,* 909 F.2d 1073, 1077 (7th Cir.1990) ("There is no federal rule that an appearance form is a valid substitute for service of process on the defendants.").

Higgins and the other individual defendants were first named in the third amended complaint, which was filed on March 30, 1992. At the time, Marozsan did not request that summons be issued for the newly-named defendants, and he did not request the Marshal to serve process.[8] As of the August 3, 1992 status hearing (126 days after March 30, 1992), he had made no effort to serve Higgins or any of the other individual defendants.

Marozsan's August 14, 1992 statement indicated that no one had advised him of the

---

**8.** A plaintiff like Marozsan, who has been granted leave to proceed *in forma pauperis,* "must request that the Marshal serve his complaint before the Marshal will be responsible for effecting such service." *Boudette v. Barnette,* 923 F.2d 754, 757 (9th Cir.1991).

need to serve summons on the newly-named defendants; that the first time he ever heard of the term "summons" was when it was mentioned during the August 3 hearing; that he had been depending on the issuance of subpoenas as a means of bringing the defendants into court and was "totally unaware of another procedural process necessary to effectuate the Complaint and bring the Defendants' [sic] before the court;" and that he was in the process of correcting his omission.

On August 25, 1992, after the time allowed by the court for showing good cause had expired, Marozsan filed a "Writ Of Praecipe," along with a list of the last known addresses of the individual *Bivens* defendants, asking the Marshals Service to serve them by certified mail. The "Writ Of Praecipe" also requested defense counsel to correct any of the addresses that were listed since, according to Marozsan, he had been denied access to the correct addresses during discovery. On September 2, 1992, Marozsan filed a "Memorandum of Facts and Authorities in Opposition to the Defendant's Opposition Response Filed August 27, 1992 to the Plaintiff's Writ of Praecipe" which again asserted that his access to the addresses of the *Bivens* defendants had been obstructed during the discovery process. Although the Marshals Service subsequently attempted to serve the *Bivens* defendants, process mailed to all but Higgins was returned. He was served on September 4, 1992. Thereafter, on September 14, 1992, Marozsan filed a "Supplemental Memorandum in Support of Plaintiff's Oppositions to Defendants [sic] Opposition Filed by Defendants on August 27, 1992—'Confidentialities of Defendant's Home Addresses,'" which sought a court order directing defendants' counsel to place the correct current addresses of all ten *Bivens* defendants on summons to enable the Marshal to effect service.

Although Marozsan eventually succeeded in serving Higgins after the 120–day period had expired, the relevant inquiry under Rule 4(j) is whether he has shown "good cause" why service of the summons and complaint was not made *within* that period. *See Tso,* 969 F.2d at 377; *Geiger,* 850 F.2d at 332; *Winters,* 776 F.2d at 1306. Here, Marozsan made no attempt to have Higgins or the

*Bivens* defendants served within the time allowed by the Rule. As of August 14, 1992, his explanation for failing to effect service was his complete ignorance of Rule 4(j) and its requirements. By September 14, 1992, however, this explanation had evolved into accusations that his inability to serve the defendants was the fault of defense counsel and the court for blocking his access to current address information in response to his earlier discovery requests. Marozsan's more recent attempts to justify his non-compliance with Rule 4(j) are disingenuous, given his initial claim that he was completely ignorant of the Rule in the first place. The fact remains that he made no attempt whatsoever to effect service within the 120–day period. If he was prevented from serving the defendants because he lacked current addresses, he could easily have applied to the court for an extension before the end of the 120–day period. He did not do so and his late efforts to obtain service have nothing to do with a showing of good cause why he failed to make service upon the defendants within the time allowed. *See Lewellen,* 909 F.2d at 1075–76; *Finch v. George,* 763 F.Supp. 967 (N.D.Ill. 1991).

In *McNeil v. U.S.,* —— U.S. ——, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993), the Supreme Court recently stated: "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel." *Id.* —— U.S. at ——, 113 S.Ct. at 1984. In *Lewellen,* the Seventh Circuit also made it clear that "[i]gnorance of the law can be no excuse for a failure to perfect service of process." 909 F.2d at 1077. Consistent with these observations, a number of courts have specifically held that a *pro se* litigant's ignorance of the 120–day time limit does not establish good cause under Rule 4(j). *See Systems Signs Supplies v. U.S. Dept. of Justice,* 903 F.2d 1011, 1013 (5th Cir.1990) (*pro se* status does not excuse litigant's complete failure to effect service); *Kersh v. Derozier,* 851 F.2d 1509, 1512 (5th Cir.1988) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules or procedural and substantive law ... To hold that a *pro se* litigant's ignorance of Rule 4(j) excuses his

compliance with the rule would automatically excuse his failure to serve his defendants timely."); *Townsel v. County of Contra Costa,* 820 F.2d 319, 320 (9th Cir.1987) ("to hold that complete ignorance of Rule 4(j) constitutes good cause for untimely service would allow the good cause exception to swallow the rule"); *Sanders v. Fluor Daniel, Inc.,* 151 F.R.D. 138 (M.D.Fla.1993) ("there can be no lenient exception granted for a Plaintiff's failure to comply with the formal Rules of Civil Procedure"); *Dunteman v. Dept. of Treasury,* Nos. 92–3006, 92–3007, 92–3008, 1992 WL 606756, 1992 U.S.Dist. LEXIS 10200 (D.C.Ill. June 22, 1992) (ignorance of Federal Rules of Civil Procedure no excuse even for *pro se* plaintiffs); *Zimmerman v. Brunton,* No. 90–C–0711–C, 1991 WL 572744, 1991 U.S.Dist. LEXIS 14168 (W.D.Wis. Sept. 25, 1991) (complaint dismissed where *pro se* plaintiff failed to properly serve United States within 120 days); *Cox v. State of New Jersey,* No. 89–4272, 1990 WL 61781, 1990 U.S.Dist. LEXIS 3658 (D.N.J. May 4, 1990) (ignorance of Rule 4(j) and illness of *pro se* plaintiff 125 days after filing of complaint did not establish good cause); *Raymond Proffitt Foundation, Inc. v. Quinby,* No. 89–7726, 1990 WL 45013, 1990 U.S.Dist. LEXIS 4294 (E.D.Pa. April 12, 1990) (complaint dismissed where *pro se* plaintiff made no effort to effect service within 120–day period); *Novak v. National Broadcasting Co., Inc.,* 131 F.R.D. 44 (S.D.N.Y.1990) (loss of counsel did not excuse failure of *pro se* plaintiffs to comply with Rule 4(j)); *Sipes v. Galaxy Airlines, Inc.,* 119 F.R.D. 691, 693 (D.Nev.1988) (where *pro se* plaintiffs made no effort to serve defendants during 120 days, ignorance of Rule 4(j) was not good cause for delay); *Bryant v. Rohr Industries, Inc.,* 116 F.R.D. 530 (W.D.Wash.1987) (*pro se* plaintiff's failure to appreciate requirements of Rule 4(j) was not good cause for failing to effect proper service even though defendant was not prejudiced for lack of notice due to receipt of summons and complaint by certified mail); *Coleman v. Greyhound Lines, Inc.,* 100 F.R.D. 476, 477 (N.D.Ill.1984) ("Inadvertent or heedless non-service is what amended Rule 4(j) is aimed at."). Because Marozsan has not demonstrated good cause for his failure to serve Higgins and the other indi-

vidual defendants within 120 days, his third amended complaint against them must be dismissed for failure to comply with Rule 4(j).

### Limitations Period for Bivens Claims

The limitations period on all of the *Bivens* claims, with the possible exception of a portion of the claim against R.L. Hornbarger, expired long before Marozsan requested leave to file his third amended complaint. The period of limitations for a *Bivens* action is the same as for an action brought under 42 U.S.C. § 1983. *McSurely v. Hutchison,* 823 F.2d 1002, 1005 (6th Cir.1987). As the Seventh Circuit explained in *Bieneman v. City of Chicago,* 864 F.2d 463 (7th Cir.1988):

> Actions under § 1983 and those under the principal fount of direct suits, *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), are identical save for the replacement of a state actor (§ 1983) by a federal actor (*Bivens* ).
>
> \* \* \* \* \* \*
>
> When the defendant is a state actor, § 1983 and direct litigation may be interchangeable, the choice between them is adventitious. There is no reason to have a different period of limitations, and a strong reason not to: any difference would give the plaintiff an incentive to pick whichever jurisdiction provided the longer period, recreating the uncertainty that the Supreme Court sought to eliminate. We conclude, therefore, that there should be a single period of limitations for all suits in which the Constitution supplies the remedy.

*Id.* at 469.

■ Thus, to be timely, a *Bivens* action, like an action brought under § 1983, must be brought within the period of limitations applicable to personal injury actions in the state in which the action is brought. *Wilson v. Garcia,* 471 U.S. 261, 280, 105 S.Ct. 1938, 1949, 85 L.Ed.2d 254 (1985). Under *Loy v. Clamme,* 804 F.2d 405, 408 (7th Cir.1986), the plaintiff in a § 1983 or *Bivens* action filed in Indiana has five years from the date the action accrued or two years from the Supreme Court's decision in *Wilson* (April 17, 1985), whichever comes first, to commence

his action. *See Moore v. State of Ind.*, 999 F.2d 1125, 1129 (7th Cir.1993); *Lewellen*, 875 F.2d at 119; *Bailey v. Faulkner*, 765 F.2d 102 (7th Cir.1985).

Marozsan commenced the present action on August 15, 1984, with the filing of his original complaint. He was subsequently granted leave to file an amended complaint on October 16, 1984 and again on December 29, 1988. However, he did not seek to add his *Bivens* claims against the individual defendants, including Higgins, until the submission of his third amended complaint on May 1, 1990. According to the third amended complaint, the alleged misconduct of defendant A.P. Cowan occurred "on or about March 8, 1954." The acts attributed to defendants W.R. Gladding, M.D. and P. Moncure, took place "on or about May 27, 1955." The claim against defendant James F. Sponzo is based on misconduct occurring "on or about December 7, 1971." The wrongdoing attributed to R.L. Hornbarger allegedly occurred "on or about May 6, 1976," as well as in August, 1981. The misconduct forming the basis of the claims against defendants Higgins and Dr. B. Gardner occurred on January 6, 1982. The claim against defendant Max Cleland is concerned with misconduct occurring "on or about October 17, 1978." The acts attributed to defendant H.M. Walters are alleged to have occurred sometime during his term as V.A Administrator "from 1980 through 1986." Lastly, the misconduct forming the basis of Marozsan's claim against defendant Sidney J. Shuman is alleged to have occurred "on or about September 11, 1979." [9] Under the analysis prescribed in *Loy*, only that part of the claim against R.L. Hornbarger based upon alleged misconduct occurring in August, 1981 was arguably brought within the applicable limitations period; none of the other *Bivens* claims were timely. *See e.g. Napier v. Thir-*

ty *or More Unidentified Fed. Agents*, 855 F.2d 1080, 1087–89 (3rd Cir.1988).

The court must still determine whether any of the *Bivens* claims relate back to the date of the original complaint or a timely amended complaint. "In a federal-question case borrowing a state statute of limitations, federal law provides the requirements for the relation back of an amendment, while state law determines the more basic question of whether the substance of the amendment mandates that it relate back in order to avoid the applicable statute of limitations." *Moore*, 999 F.2d at 1130; *see Diaz v. Shallbetter*, 984 F.2d 850, 853–54 (7th Cir.1993). "Under Indiana law, after the statute of limitations has run, the plaintiff may add a new defendant only after demonstrating that the amendment relates back to the original complaint." *Moore*, 999 F.2d at 1130 (citing *Hupp v. Hill*, 576 N.E.2d 1320, 1327 (Ind.App.1991)).

Fed.R.Civ.P. 15(c), which contains the federal standard for determining whether an amendment relates back, provides in pertinent part as follows:

> An amendment of a pleading relates back to the date of the original pleading when
>
> (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
>
> (2) the claim where defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the peri-

---

9. Although the third amended complaint also alleges that defendant Shuman "did actively exert himself from 1983 forward to utter falsehoods, misrepresentations and half truths, and 'COVER UP TO THE BEST OF HIS ABILITY THE ARBITRARY AND ERROR RIDDEN RESULTS OF THE ADJUDICATION OFFICERS AND THE BVA PANELS BENEATH HIM, FROM THE PUBLIC AND FROM THEIR ELECTED REPRESENTATIVES ON THE SENATE AND HOUSE VETERANS AFFAIRS COMMITTEES WHO WERE THEN CONSIDERING THE REFORM LEGISLATION TO OPEN VA BENEFIT DECISIONS TO FEDERAL COURT JUDICIAL REVIEWS,'" these conclusory allegations fail to state a claim for violation of Marozsan's constitutional rights and, in any event, Count I ¶33 of the third amended complaint avers that "the last Tortious Act committed by the defendants [occurred] on May 26, 1984 in finalizing the plaintiff's Administrative Remedies." (Third Amended Complaint, p. 10.)

od provided by Rule 4(j) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.[10]

In this case, the *Bivens* claims against defendant A.P. Cowen, W.R. Gladding, M.D., P. Moncure, James F. Sponzo and Max Cleland (as well as that part of the claim against R.L. Hornbarger based upon misconduct occurring on or about May 6, 1976) would have been untimely even if they had been included in the original complaint. In order for the remaining claims to relate back to the filing of the original complaint or a timely amended complaint, Marozsan must demonstrate that provision (2) of the Rule has been satisfied and he must also show that the putative defendants received *actual* notice of the action against them under provision (3) within 120 days of the filing of the original complaint or a timely amended complaint—the period for service of process under Rule 4(j). *Moore*, 999 F.2d at 1130.

 Marozsan has not made such a showing. Even if it were assumed that his *Bivens* claims against the individual defendants arose out of the same transaction or occurrence as the claims described in his original, first or second amended complaints, there is no indication that any of the *Bivens* defendants, with the assumed exception of R.L. Hornbarger,[11] had actual notice of the institution of the action at any time within the applicable limitations period or within 120 days of the filing of any timely complaint. The fact that Higgins is an employee of the V.A. and represented by the same counsel, the United States Attorney, who has appeared for the United States and the V.A., does not constitute timely notice to Higgins or any of the other *Bivens* defendants who have yet to be served. *See Moore*, 999 F.2d at 1130–31. Accordingly, only the claim against R.L. Hornbarger arguably relates back to the original complaint; the rest do not. In addition, Marozsan has neither asserted nor presented any admissible evidence to justify equitable tolling. Except for that portion of the claim against R.L. Hornbarger based upon alleged misconduct occurring in August 1981, it must be concluded that the *Bivens* claims are barred by the statute of limitations.

### Bivens Claim Against Defendant Higgins

Count II, Part I, Section G, ¶ 6 of the third amended complaint alleges that defendant

---

10. Rule 15(c) was amended effective December 1, 1991, to change the result in *Schiavone v. Fortune*, 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986), with respect to a misnamed defendant and "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense." Fed.R.Civ.P. 15(c) *Notes of Advisory Committee*—1991 Amendment. Thus, "[a]n intended defendant who is notified of an action within the period allowed by Rule 4(n) [now 4(j)] for service of a summons and complaint may not under the revised rule defeat the action on account of a defect in the pleading with respect to the defendant's name, provided that the requirement of clauses (A) and (B) have been met." *Id. See Hill v. U.S. Postal Service*, 961 F.2d 153 (11th Cir.1992). The present case is not concerned with a misnamed defendant. *See e.g. Worthington v. Wilson*, 8 F.3d 1253, 1257 (7th Cir.1993). Rather, it is concerned with individual defendants who were never named at all in the original, first or second amended complaints, who received no notice of any action against them within the pertinent limitations period, and who received no notice of any action against them within 120 days of the filing of the original, first or second amended complaints. The court has, nevertheless, quoted and applied Rule 15(c) as amended, because this action was pending at the time of the amendment and application of the amended rule is "just and practicable" in this instance. *Order Amending Federal Rules of Civil Procedure*, 111 S.Ct. Preface 813 (April 30, 1991).

11. Marozsan named "V.A. Regional Adjudication Officer R.L. Hornbarger" in the caption of his original complaint, but he made no reference to Hornbarger in the body of the complaint. The claim against Hornbarger, moreover, was dropped from the first and second amended complaints. Out of an abundance of caution, the court will assume, without deciding, that Hornbarger received sufficient notice through the original complaint of the action against him and that such notice with respect to that portion of the action based upon alleged misconduct occurring in August, 1981 was received within the period of limitations.

Higgins violated Marozsan's right to due process under the Fifth Amendment:

> The defendant J. Higgins, Chairman of the V.A. Rating Board No. III, considering plaintiff's claim on or about January 6, 1982, did in the presence of a living outside witness (Susan Pantzer of Sen. Lugar's Office), disregard specialist Orthopedic Surgeons statements, long history of the plaintiff's unemployabilities and other record denied plaintiff his deserved 100% disabled service connected disability rating on his appeal from the 20% reduced rating complained of in paragraph (5)(b) of this Count II and did thus deprive Plaintiff of his property interest constrary [sic] to Amendment V, U.S. Constitution.

To the extent that Marozsan is challenging the failure of defendant Higgins to increase his disability rating, or is otherwise questioning Higgins' determination of his request for benefits, his claim would be barred by § 211(a), which "clearly deprives a federal court of the power to alter determinations made by the V.A. regarding disability ratings and entitlements to benefits." *Winslow v. Walters,* 815 F.2d 1114 (7th Cir.1987); *Higgins v. Kelley,* 824 F.2d 690, 691 (8th Cir. 1987). The court, accordingly, is left to consider only the constitutional adequacy of the V.A.'s procedures during those proceedings involving Higgins.

▮ It is undisputed that once Marozsan began receiving V.A. disability benefits he acquired a "property interest" in their continued receipt, protected by the Due Process Clause. *See Mathes v. Hornbarger,* 821 F.2d 439, 441 (7th Cir.1987). However, the determination that a person has a protected property interest, in itself, does not establish a constitutional violation. *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 277–79, 110 S.Ct. 2841, 2851–52, 111 L.Ed.2d 224 (1990). " 'In a procedural due process claim, it is not the deprivation of property or liberty that is unconstitutional; it is the deprivation of property or liberty *without due process of law* —without adequate procedures.' " *Colon v. Schneider,* 899 F.2d 660, 671 (7th Cir.1990) (*quoting Daniels v. Williams,* 474 U.S. 327, 329, 106 S.Ct. 662, 678, 88 L.Ed.2d 662 (1986) (Stevens, J. concurring)). Accordingly, the court must consider whether the process afforded Marozsan during the proceedings involving Higgins was constitutionally adequate.

In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court described three distinct factors to be considered in resolving the issue of whether the administrative procedures provided are constitutionally sufficient:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, *including* the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903.

In this case, Higgins was the Chairman of the Rating Board which heard Marozsan's appeal from the V.A.'s rating decision of August 12, 1981 and determined that he was only entitled to a 20 percent service-connected disability rating with respect to his back condition, from July 24, 1981. After Marozsan filed a "Notice of Disagreement" on September 29, 1981, the V.A. mailed him a "Statement of the Case," along with a cover letter instructing him on how to properly appeal that decision. (Plaintiff's Response to Defendant Higgins' Motion for Summary Judgment, Ex. 17; Higgins Affidavit, Ex. 2.) The V.A. also reviewed the August 12 decision on October 9, 1981. (Plaintiff's Response, Ex. 22; Higgins Affidavit, Ex. 1.) Thereafter, Marozsan filed an appeal on October 16, 1981, explaining the reasons why he felt the August 12 decision was incorrect. (Plaintiff's Response, Ex. 16.) A hearing was held on January 6, 1982, to gather evidence and allow Marozsan to present his arguments. Present at that hearing were members of the V.A. Rating Board, including Higgins, as well as Marozsan, James Walters of the Veterans of Foreign Wars, who was an accredited representative of Marozsan, and Susan Pantzer, an observer who was a mem-

ber of Senator Richard G. Lugar's staff. (Higgins Affidavit, Ex. 3, p. 1.)

During the January 6, 1982 hearing, Marozsan was permitted to testify and introduce documentary evidence. Walters also testified and submitted documents on behalf of Marozsan. (Higgins Affidavit, Ex. 3.) On the following day, Higgins requested a medical report from Dr. Frederick J. Ferlic, an orthopaedic surgeon who had examined Marozsan on October 19, 1981. (Higgins Affidavit, Ex. 4.) After receiving this additional medical evidence along with the transcripts from the January 6 hearing, the Rating Board issued its decision on March 12, 1982 (Higgins Affidavit, Ex. 5), affirming the August 12 decision and concluding that Marozsan was only entitled to a 20 percent service-connected disability rating from July 24, 1981. (Higgins Affidavit, Ex. 5.) According to an affidavit submitted by Higgins, the March 12, 1982 decision "was based on 'all the evidence in the record' including that presented at the hearing and the information provided by F.J. Ferlic, M.D." (Higgins Affidavit, p. 7.) Marozsan was later permitted to appeal this and other V.A. rating decisions to the BVA. (See Attachments 4 and 5 to Declaration of Martin Sendek.)

■■■ The process afforded Marozsan was constitutionally adequate. At the January 6 hearing, he was permitted to submit documentation about his medical history, testify on his own behalf, and have a representative attend the hearing and testify. These procedures met the due process requirements which have been recognized by the Seventh Circuit. *See American Nat. Bank & Trust Co. v. City of Chicago,* 826 F.2d 1547, 1550 (7th Cir.1987); *Davis v. Lane,* 814 F.2d 397, 402 (7th Cir.1987); *Toney–El v. Franzen,* 777 F.2d 1224, 1227 (7th Cir.1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2909, 90 L.Ed.2d 994 (1986). Additionally, there is nothing in the record to suggest that Higgins and the V.A.'s Rating Board rendered a decision based upon evidence other than what was submitted. Higgins and the Rating Board did not render a decision until the additional medical evidence that they requested on January 7 was received. It was Marozsan who brought Dr. Ferlic's medical report to the attention of

Higgins and the Rating Board, and it was this information that Higgins and the V.A. Rating Board relied upon in their decision to affirm the 20 percent disability rating.

Marozsan argues, however, that since he did not receive a 100 percent disability rating Higgins must have disregarded the evidence submitted at the hearing, thereby violating his right to due process. But, as Higgins points out, it is not the result obtained that determines whether due process was afforded; rather, it is whether the procedural safeguards were sufficient to prevent error in the truth-finding process. In this case, the procedural safeguards were sufficient. Marozsan was given the opportunity to appeal the rating decisions of 20 percent of September 7, 1982 and May 7, 1984. He received all of the process that was due with respect to the hearing of January 6, 1982 and the proceedings in which Higgins participated. Higgins, therefore, is entitled to summary judgment on Marozsan's *Bivens* action.

### Qualified Immunity

■■■ Lastly, the court is convinced that defendant Higgins is protected from any claim for damages arising out of an alleged violation of Marozsan's constitutional rights under the doctrine of qualified immunity. The Supreme Court established the doctrine of qualified immunity in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The *Harlow* Court rejected the subjective element of good faith in favor of an objective analysis. *Id.* 457 U.S. at 818, 102 S.Ct. at 2738. Thus, the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* To defeat a qualified immunity defense, a plaintiff bears the burden of demonstrating that "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, ... the law clearly proscribed the actions the defendant ... took." *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411

(1985); *Gorman v. Robinson,* 977 F.2d 350, 353–54 (7th Cir.1992). "The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms.... The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986). Thus, the Supreme Court has observed that "the qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate that law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). More recently, the Supreme Court in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) stated: "[O]ur cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* 483 U.S. at 640, 107 S.Ct. at 3039; *Gorman,* 977 F.2d at 354; *Schertz v. Waupaca County,* 875 F.2d at 583; *Smart v. Simonson,* 867 F.2d 429, 431 (7th Cir.1989); *Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.1989); *Green v. Carlson,* 826 F.2d 647, 651 (7th Cir.1987). In the present case, Marozsan has failed to demonstrate that any of the procedures followed during proceedings in which defendant Higgins participated violated any clearly established right at that time.

*Recommendation*

For the foregoing reasons, it is **RECOMMENDED** that plaintiff's claims for monetary damages against the United States, the V.A. and any V.A. officers or employees in their official capacities, be dismissed under Fed.R.Civ.P. 12(b)(1), for lack of jurisdiction over the subject matter; that plaintiff's claims regarding the alleged existence of a fiduciary relationship between veterans and the V.A., the alleged falsification of testimony by V.A. officers before congressional committees, the alleged existence of a "symbiotic" relationship between the V.A. and National

Veterans Service Organizations, and preferential treatment for certain veterans, be also dismissed under Rule 12(b)(1), for lack of jurisdiction over the subject matter; that plaintiff's *Bivens* claims be dismissed with prejudice under Rule 12(b)(6), for failure to state a claim upon which relief can be granted; and that summary judgment be granted in favor of defendants and against the plaintiff in all other respects.

**ANY OBJECTIONS to this report and recommendation must be filed with the Clerk of courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See** *Thomas v. Arn,* **474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);** *Lockert v. Faulkner,* **843 F.2d 1015 (7th Cir.1988);** *Video Views, Inc. v. Studio 21 Ltd.,* **797 F.2d 538 (7th Cir.1986).**

Dated this 10th day of December, 1993.